**RESIDENT ADVISORY BOARD et al.**

v.

**Frank L. RIZZO et al.**

**Civ. A. No. 71–1575.**

United States District Court,
E. D. Pennsylvania.

April 1, 1980.

On Motion for Clarification Dec. 19, 1980.

Jonathan M. Stein, Harold R. Berk, Community Legal Services, Philadelphia, Pa., for Resident Advisory Board.

Alan J. Davis, City Sol., Mark A. Aronchick, Asst. City Sol., Philadelphia, Pa., for City of Philadelphia.

Harold Cramer, Arthur W. Lefco, Philadelphia, Pa., for Philadelphia Housing Authority.

Peter F. Vaira, U. S. Atty., Walter T. Batty, Jr., John Penrose, Asst. U. S. Attys., Philadelphia, Pa., for Housing and Urban Development.

Peter A. Galante, Philadelphia, Pa., for Redevelopment Authority.

Joseph M. Gindhart, Philadelphia, Pa., for Whitman Council, formerly Whitman Area Improvement Council.

Richard S. Meyer, Stephen J. Harmelin, Thomas J. Bender, Jr., Philadelphia, Pa., for Jolly Construction Co. and A & R Development, Inc.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In considering plaintiffs' motion to enjoin this most recent attempt to interfere with the construction of the Whitman Park townhouses as ordered by this Court, it is necessary once again to review the history of this protracted litigation. Having found that the actions of municipal and federal defendants in terminating the construction of the townhouses amounted to statutory violations, and in the case of the City of Philadelphia and then–Mayor Rizzo, Constitutional violations, this Court on November 5, 1976 entered an injunctive order, which provided in part:

> (1) The defendants, Philadelphia Housing Authority, Redevelopment Authority for the City of Philadelphia, City of Philadelphia, Department of Housing and Urban Development, their officers, agents, and employees shall immediately take all necessary steps for the construction of the Whitman Park Townhouse Project as planned.

> . . . . .

> (4) All parties to this litigation are enjoined from taking any action which will interfere in any manner with the construction of the Whitman Park Townhouse Project. (E.D.Va.1976) 425 F.Supp. at 1029.

The judgment of this Court was affirmed by the Third Circuit, with one exception. Since this Court had found no statutory or Constitutional violations on the part of defendants–intervenors, the Whitman Area Improvement Council and its successor the Whitman Council, Inc., Alice Moore, Fred Druding, and all members of Whitman Area Improvement Council, and the Whitman Council, Inc., and its Officers, Agents, Servants, Representatives and Employers, and all other persons acting in concert with them or otherwise participating in their aid (hereinafter the Whitman Council *), the Third Circuit reversed that part of this Court's Order which enjoined the Whitman Council from interfering in any manner with the construction of the townhouses. 564 F.2d at 152. The Third Circuit stated, however, that this Court might modify its Order in the event that the Whitman Coun-

---

* This is the organization which sought to intervene as a defendant in this litigation. *See Sworob v. Harris*, 451 F.Supp. 96 (E.D.Pa. 1978). The attorney for the Whitman Council considers every resident of Whitman Park to be a member of the Council, and a defendant in this action. (Tr. 1–31).

cil, at some time in the future, interfered with construction of the townhouses. *Id.* We have now reached that time; the Whitman Council's recent threats and attempts to interfere with construction of the townhouses require this Court to enter an Order enjoining the Whitman Council and all other persons acting in concert with them from interfering with the construction of the townhouses.

Upon the motion of the Resident Advisory Board plaintiffs, this Court on March 14, 1980 entered a temporary restraining order, to be effective on March 17, 1980, which barred the Whitman Council from interfering with the construction of the townhouses, which was scheduled to begin on March 18, 1980. The Court ordered a hearing on March 19, 1980 in connection with the motion for preliminary and permanent injunction. Specifically, the temporary restraining order barred the Whitman Council and those acting in concert with them from engaging in activities which would interfere in any way with the construction of the townhouses as ordered by this Court. In addition, the temporary restraining order, in recognition of defendants–intervenors' First Amendment rights to express their opposition to the construction of the townhouses, set forth a detailed plan for picketing and demonstrating, which barred all "picketing, demonstrations, rallies, protests or similar assemblies" within an area bounded by Delaware Avenue, Johnston Street, Third Street, and Ritner Street, except that picketing, demonstrations, etc. are permitted in a parking lot area adjacent to the site, and one informational picket is permitted at each of the ten gates in the fence surrounding the construction site.

On March 19, 20 and 21, this Court held hearings on plaintiffs' motion for a preliminary and permanent injunction. At the hearing, the Court granted the motion of A&R Development, Inc., the project developer, and Jolly Construction Co., the general contractor, to intervene as parties plaintiff. The intervenors, along with HUD, joined plaintiffs' motion for preliminary and permanent injunction. Plaintiffs and plaintiffs–intervenors seek an injunction

similar to the temporary restraining order entered by this Court, except that they request that informational pickets not be permitted. The Whitman Council argues that the temporary restraining order should be lifted, and no injunction should be entered. For the reasons hereinafter set forth, the Court will enter an injunction similar in form to the temporary restraining order.

Plaintiffs and intervenors, in seeking injunctive relief, appear to suggest that the applicable standards are: (1) likelihood of success on the merits; (2) likelihood of irreparable harm; (3) possibility of harm to other interested persons; and (4) the public interest. *Constructors Ass'n of Western Pennsylvania v. Kreps,* 573 F.2d 811, 815 (3d Cir. 1978).

The Court has no difficulty in finding that all four of these criteria have been satisfied. Likelihood of success on the merits has long since been decided by this Court's Order to construct the townhouses, which has twice been affirmed by the Third Circuit, and as to which certiorari has twice been denied by the United States Supreme Court. *See RAB v. Rizzo,* 425 F.Supp. 987 (E.D.Pa.1976), *aff'd in part,* 546 F.2d 126 (3d Cir. 1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Sworob v. Harris,* 451 F.Supp. 96 (E.D.Pa.1978), *aff'd,* 578 F.2d 1376, *cert. denied,* 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979). As to irreparable harm, this Court, when it ordered the construction of the townhouses, determined that the plaintiffs would be irreparably injured by the defendants' failure to build the houses. Any further delay in construction further prolongs and exacerbates that injury. 429 F.Supp. at 226. We have also previously determined that the public interest will be best served by the "building of 120 townhouses on a vacant site in a city which is in dire need of decent housing for low–income families." 429 F.Supp. at 226. As to the final criterion, the possibility of harm to other interested persons, we fail to see how the construction of the townhouses as planned will bring harm to anyone in a city where there is an

urgent need for housing. 429 F.Supp. at 226. In the context of possible harm to other interested persons which may result from the particular injunctive relief requested at this time, the Whitman Council raises First Amendment issues. As we discuss in detail below, the injunction which we will enter permits the Whitman Council to express their views to the full extent required by the First Amendment.

While these four criteria for a preliminary injunction are satisfied, we are not faced here with a conventional motion for a preliminary injunction seeking to preserve the status quo pending final decision on the merits. Here, preservation of the status quo means enforcement of this Court's Order for construction of the townhouses. Now that construction of the townhouses has commenced, we are faced with the situation discussed by the Third Circuit—the Whitman Council's interference with construction. The record before the Court clearly demonstrates that additional injunctive relief is *now* necessary to permit construction of the townhouses to proceed peacefully and safely.

The Court finds the testimony of Adam Bantner, Jolly Company's superintendent assigned to the Whitman site, to be credible. Bantner arrived at the construction site on the morning of January 4, 1980 to inspect the site and make preliminary plans for the placement of construction trailers and equipment. When Bantner attempted to leave the site his pick–up truck's exit was impeded by a vehicle driven by a local resident, which had pulled in front of him. He was approached first by two or three people and soon after by a total of six or eight Whitman residents. (Tr. 1–43, 44). After he had identified himself in response to their questioning, he was told by a Whitman resident that he was lucky "the men wasn't home because I would have been beaten up by that time." (Tr. 1–45). Bantner was told the development "would never be built" and that "if I put a trailer [on the site] they would have blowed it up." (Tr. 1–46).

Bantner then accompanied the Whitman residents into the home of Patricia Egger, on Porter Street, across from the Whitman site. Whitman residents in the house related the past history of continual harassment of the prior builder who was eventually driven off by local residents and who then went bankrupt, according to those addressing Bantner. (Tr. 1–49). "They told me [Bantner] they'd do the same thing to [Jolly Co.]." (*Id.*) Bantner was shown photos and newspaper reports of the demonstration in 1971 and told that the demonstrations forced a shut–down of construction and the withdrawal of the builder. He was also told that local residents would do the same thing to him and his company. (Tr. 1–49).

While in the Porter Street house, Bantner was called to the telephone to speak to Fred Druding, the Whitman Council President, who told him that there would be bloodshed if Bantner's company built the development. (Tr. 1–50). He was told by Druding, "if you don't want to see bloodshed, you better stop [Jolly Co. personnel]" from coming to Philadelphia that day. (Tr. 1–51).

All those in the Porter Street house said that they would stop the job. (Tr. 1–51). According to Bantner, they said that they could not control their young people; he was warned, "don't ever let my life depend on the Philadelphia police to stop them because they wouldn't." (Tr. 1–51, 52). Bantner was told also that human bodies would be placed under the wheels of the trucks and that residents would get on top of trucks and form human rings around the site. (Tr. 1–73). Local residents in the Porter Street house also made reference to bombs. (Tr. 1–51).

While Bantner was in the house, Whitman residents screamed at him and shook their fingers in his face. He had never seen such hostility, and he felt so threatened that he wanted to get out of town quickly, forget the construction business and never come back to work. (Tr. 1–54, 55, 56).

Bantner also told the Whitman residents that he was looking into finding a place in the area to live during construction, and

was told by Whitman residents that all real estate agents would be contacted to prevent a residence being found for him. He was also told by them that if he bought a house and stayed there, "you wouldn't last through one night, you'd be burned out." (Tr. 1–150, 152).

At the site on January 4th, Bantner asked a Whitman resident if he ever hurt anybody and was told, "No. Not yet." (Tr. 1–67). He was asked, "Have you ever been hit by a woman?" (Tr. 1–67). He was told, "You will." (*Id.*) He was also told that anything on the job will be blown up. When Bantner countered, "you wouldn't kill anybody, would you?", the answer was "Don't try us." Bantner said, "That's murder." Residents said, "don't try us." (Tr. 1–67).

After a second phone call with Fred Druding at the Porter Street house, Bantner, feeling considerably unsettled and in great fear, told residents that he was leaving the worksite and returning to Baltimore, and advising his company to do the same. (Tr. 1–138, 142). Bantner's employer, Jolly Company's Vice–President Victor Hencken, confirmed that Bantner called him from the Porter Street house in an incoherent fashion, telling him not to come up to Philadelphia. (Tr. 1–190). Later, in a second phone conversation with Hencken, according to the latter, Bantner sounded "extremely shaken," and relayed the foregoing to him. (Tr. 1–191).

Bantner was also told to convey the threats to his wife, and someone did call his wife on January 4, 1980 to tell her of the threats made to him. (Tr. 1–154). After the January 4, 1980 confrontation, his wife called Mrs. Patricia Egger, in whose home Bantner was questioned, and sarcastically thanked her "for [sending] her husband home safely" and "for him losing his job." (Tr. 2.6).

On March 18, 1980, the first day of construction when the temporary restraining order was in effect, enjoining interference and threats against the builder, additional threats were made to Bantner at the site.

He was asked if he had driven to the site, and if he had driven a car they were "going to burn it." (Tr. 1–57). He was told that the site "will be empty for another 10 years [b]ut you'll never be around to see it." (Tr. 1–57). The latter was said by a person standing on the property site. (Tr. 1–167).

That Whitman residents intend to stop construction, and use any means toward that end, was confirmed by the testimony of Gertrude Hogan. Mrs. Hogan, who lives in a home adjoining the construction site, testified that, if there were no injunction, she would engage in activities similar to those in 1971 when Whitman residents halted construction of the townhouses. As the Court found in 1976 after the trial:

At 7:30 a. m. on March 23, 1971, approximately thirty women entered the Whitman site and gathered around a bulldozer and backhoe, blocking the operations of the contractor and refusing to leave the area when requested to do so.... On that same day, demonstrators at the Whitman site blocked a truck attempting to make a delivery to the Whitman Park Townhouse Project.... Again, on March 25, 1971, demonstrators refused to permit a bulldozer to be operated on the Whitman site. 425 F.Supp. at 998 (citations and footnotes omitted).

. . . . .

The opposition to the Whitman project took the form of mass demonstrations at the project site led by WAIC. Frequently, demonstrators would surround a piece of construction equipment and prevent the workmen from operating the equipment. Demonstrators also prevented trucks from making deliveries to the area.... Some of the demonstrators engaged in name calling, obscenities, threats, and the use of racial slurs. Other demonstrators stated that they did not want their neighborhood exposed to the type of people who would move into the proposed public housing. A few demonstrators expressed their opposition to the Whitman Park Townhouse Project on the basis that it would bring Blacks into the

neighborhood and destroy the racial homogeneity of the area. . . . The residents and members of WAIC who opposed the Whitman Park Townhouse Project publicly stated their opposition thereto on the basis that public housing projects are unsafe, unsanitary, lead to increased crime or that the proposed residents of the Whitman project were going to receive something for nothing, which members of WAIC were unable to receive because of their higher incomes. *Id.* at 1006 (citations and footnotes omitted).

In any event, whatever the motivation for the opposition, there is no doubt that the Whitman residents are determined to interfere with the construction. (Tr. 1–272; 1–292, 293; 2.74; 2.115; 2.150, 151).

 On the basis of this record, we find that members of the Whitman Council and persons acting in concert with them have interfered with construction and intend to continue to interfere with construction by threats, physical violence, intimidation, and coercion directed toward those engaged in construction, and by using similar means to prevent the delivery of equipment and construction materials to the site. The evidence presented at the hearing of March 19–21, 1980 is in itself sufficient to support these findings. The Court has, nonetheless, considered the prior record in this case, showing similar and related offenses committed in the past as evidence of a pattern of conduct relevant to the issue before this Court. As Mr. Justice Brennan has written in *Keyes v. School Dist. No. 1, Denver, Colorado,* 413 U.S. 189, 205, 208–209, 93 S.Ct. 2686, 2695, 2697, 37 L.Ed.2d 548 (1973):

> This is merely an application of the well-settled evidentiary principle that "the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent." 2 J. Wigmore, Evidence 200 (3d ed. 1940). "Evidence that similar and related offenses were committed . . . tend[s] to show a consistent pattern of conduct highly relevant to the issue of intent."

*Nye & Nissen v. United States,* 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949). Similarly, a finding of illicit intent as to a meaningful portion of the item under consideration has substantial probative value on the question of illicit intent as to the remainder. See, for example, the cases cited in 2 Wigmore, *supra,* at 301–302. And "[t]he foregoing principles are equally as applicable to civil cases as to criminal cases . . ." *Id.,* at 300. See also C. McCormick, Evidence 329 (1954).

We have found an injunction to be required by the Whitman Council's demonstrated interference with the construction of the townhouses as ordered by this Court. A court has broad equitable powers to order an effective remedy and to ensure its implementation. *Hills v. Gautreaux,* 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544, 47 L.Ed.2d 792 (1976); *Swann v. Charlotte–Mecklenburg Board of Ed.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Furthermore, a court has inherent powers to protect and effectuate its prior judgment. *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Brown v. Board of Education,* 349 U.S. 294, 95 S.Ct. 753, 99 L.Ed. 1083 (1955); *United States v. State of Washington,* 459 F.Supp. 1020, 1115 (D.Wash.1978). An injunction seeks not only to eliminate past wrongdoing, but also to prevent its recurrence. *United States v. W. T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Swift & Co. v. United States,* 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed. 587 (1928); *Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 951 (2d Cir. 1978). Finally, neither private persons nor government officials can nullify this Court's ruling that the Constitutional violations found herein require the construction of the townhouses as planned. *Cooper v. Aaron, supra,* 358 U.S. at 17–18, 78 S.Ct. at 1409; *see also RAB v. Rizzo,* 463 F.Supp. at 700.

Moreover, the record before this Court clearly demonstrates not only motivation and intention to interfere with construction, but presents a strong likelihood of violent confrontation which may result in danger

to life and property. As previously pointed out by this Court, "a history of tension or violence does not excuse the denial of civil rights." 425 F.Supp. at 987. It does, however, justify the adoption of measures which will permit construction to proceed without violence or other impediment. Any activity that may threaten human life may be enjoined on the ground that a court of equity will not gamble with human life, at whatever odds, and on the ground that for loss of life there is no remedy that is, in an equitable sense, adequate. *Harris Stanley Coal & Land Co. v. Chesapeake & Ohio Ry. Co.,* 154 F.2d 450 (4th Cir.), *cert. denied,* 329 U.S. 761, 67 S.Ct. 111, 91 L.Ed. 656 (1946).

The Whitman Council argues that an injunction similar to the temporary restraining order unjustifiably limits their First Amendment rights. Most of the actions enjoined, e. g. harming persons or property and interfering with deliveries, have no First Amendment implications. Concerns relating to freedom of expression arise only in connection with that portion of the injunction which bars picketing and demonstrations in a defined area surrounding the construction site with two exceptions: (1) demonstrations are permitted in a parking lot area adjacent to the site; and (2) one informational picket is permitted to stand beside each of the ten gates in the fence surrounding the site.

It has long been recognized that the First Amendment permits reasonable regulation of the time, place and manner of picketing or other forms of expression in order to further significant governmental interests. *Cox v. New Hampshire,* 312 U.S. 569, 575–76, 61 S.Ct. 762, 765 (1941). The Supreme Court has consistently upheld reasonable "time, place and manner" restrictions. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (ban on wilful making, on grounds adjacent to a school, of any noise which disturbs the good order of the school session); *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (ban on demonstrations in vicinity of jail); *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (limitation on the use of sound trucks).

Limitations on the areas in which the Whitman Council may demonstrate and picket is a reasonable "place and manner" restriction in furtherance of an important governmental objective–decent housing for low and moderate income families, which has heretofore been denied them in violation of the Constitution and laws of the United States. As we have pointed out, such restrictions are necessary to permit construction to proceed peacefully. At the same time, the injunction permits ample opportunity for the Whitman Council and its members to express their views. An informational picket may stand to the side of each of the ten gates and speak for sixty seconds to anyone entering the gate. Furthermore, an unlimited number of pickets or demonstrators are permitted to congregate in the large parking lot area adjacent to the site. Anyone demonstrating on this parking lot would be fully visible and audible to persons on the construction site. (Tr. 2.124–125).

This Court on March 17, 1978 issued a Memorandum embodying the agreement of the parties, which provided in part: "The City of Philadelphia shall provide such police protection as is needed to insure the completion of the 120 townhouses." Chief Inspector George Fencl, supervisor of the Civil Affairs Unit of the Philadelphia Police Department, testified as to the necessity for such restrictions on picketing and demonstrations in light of the responsibility of the police to provide protection and prevent violence. Fencl testified that he had considered "what an appropriate plan would be for the discharge of the obligations of the City of Philadelphia to provide security for the Whitman Park Project." (Tr. 3.9). In doing so, he consulted with the Police Commissioner and Deputy Commissioner, the United States Marshal and his Deputy, and members of the City Solicitor's staff. (*Id.*) Fencl considered it necessary to limit picketing and demonstrating in order to assure tranquility in the Whitman area and to enable construction to proceed peacefully, while permitting residents to "express their views" and "vent their feelings." (Tr. 3.41–.42). The plan proposed by Fencl

would have permitted two informational pickets at each of the ten gates—one picket in favor of constructing the townhouses and the other opposed. (Tr. 3.22). The injunction which will be entered by this Court will limit the Whitman Council and those acting in concert with them to one informational picket at each gate. Although to date there have been no groups other than the Whitman Council picketing or demonstrating at the site, in the event others intend to picket in favor of the construction they will likewise be limited to one informational picket at each of the gates.

Plaintiffs and plaintiffs—intervenors seek the removal of all informational pickets from the gates on the ground that they will interfere with constructions. In the event, the picketing as provided by the Court's Order causes any interference with construction, the Court will consider at that time whether its Order should be modified.

This Memorandum is in lieu of Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

### ORDER

AND NOW, this 1st day of April, 1980, the Court, for the reasons set forth in the Memorandum of this Court dated April 1, 1980, hereby ORDERS that the Whitman Area Improvement Council and its successor the Whitman Council, Inc., Alice Moore, Fred Druding, and all members of the Whitman Area Improvement Council and the Whitman Council, Inc., its officers, agents, servants and representatives and employees, and all other persons acting in concert with them or otherwise participating in their aid (hereinafter "Whitman Council") are ENJOINED until such time as construction of the 120 townhouses is completed and all of the houses are occupied, from:

1. Picketing, protesting, rallying, demonstrating or similarly assembling in the Whitman Construction Site Area (that area enclosed by the dotted line on the plan attached hereto) except as follows:

a. At each gate (designated by "X" within the "Whitman Park" area on the attached plan), there may be no more than one informational picket who shall remain in an area outside the passageway as designated by the United States Marshal or his Deputy at the Site. Such informational picket shall not obstruct, block or impede passage to or from the Whitman Construction Site (designated as shaded area marked "Whitman Park" on the attached plan), but may peacefully converse with persons entering or leaving the Whitman Construction Site, provided that such conversation be limited to sixty seconds in duration, and provided that persons who do not wish to stop or converse with the picket may freely pass.

b. All other picketing, demonstrations, rallies, protests, or similar assemblies shall be confined to the barricaded sidewalk area on the east side of Front Street, between Oregon Avenue and Shunk Street, as reflected on the attached plan.

2. Obstructing, impeding, hindering, delaying, interrupting or blocking any street, passageway or access route in or to the Whitman Construction Site Area, or attempting or threatening any such actions.

3. Causing any damage or other harm to persons, property or materials in any manner connected with construction at the Whitman Park Site, or attempting or threatening to cause any such damage or harm.

4. Entering the construction site (designated by shaded area marked "Whitman Park" on the attached plan) without the express permission of the person in charge of the construction of the Whitman Park townhouses or of the United States Marshal, or his Deputy at the Site.

5. Preventing or attempting to prevent by physical violence or force, intimidation, coercion, threats or any other means, any person or vehicle having lawful business with A&R Development or Jolly Co. from

freely entering or leaving the Whitman Construction Site Area.

6. Using any means to coerce, threaten or intimidate or to attempt to coerce, threaten or intimidate A&R Development or Jolly Co. or their employees, or others having lawful business upon the Whitman Construction Site, from going upon or leaving such Site or doing business with them.

7. Preventing or attempting to prevent by physical obstruction, violence, intimidation, coercion, or threats thereof, or any other means, deliveries and shipments of materials intended for use at the Whitman Construction Site at any location.

8. Engaging in physical obstruction, violence, intimidation or coercion, or threats thereof, directed towards A&R Development, Jolly Co. or their subcontractors or their employees.

9. Seizing, restraining, or damaging any personal or real property of A&R Development or Jolly Co. or any of their subcontractors or employees.

10. Encouraging or inducting others to engage in any of the aforesaid activities.

It is HEREBY FURTHER ORDERED that:

1. The United States Marshal and Philadelphia Police Department shall have such personnel available at the Whitman Construction Site Area which those agencies deem necessary to enforce this Order and all prior Orders of this Court.

2. The United States Marshal for the Eastern District of Pennsylvania is authorized in his discretion to deputize as Deputy United States Marshals those Philadelphia police officers assigned by the City of Philadelphia or the Mayor thereof to implement the provisions of paragraph 20 of the Court's Memorandum of March 17, 1978, which provides: "The City of Philadelphia shall provide such police protection as is needed to insure the completion of the 120 townhouses." Any Philadelphia police officer who is deputized by the United States' Marshal shall promptly deliver custody to the United States Marshal of anyone arrested for violations of this Order or for any other federal offense.

3. That plaintiffs have leave to serve true copies of this Order upon any of the defendants–intervenors and upon any of the persons acting in concert with them or otherwise participating with them or acting in their aid or behalf.

4. That the United States Marshal and his Deputies may serve true copies of this Order upon any of the defendants–intervenors and upon any persons acting in concert with them or otherwise participating with them or acting in their aid or behalf.

5. In the event the United States Marshal receives information that any person or persons, other than the Whitman Council or those acting in concert with them, intend to picket, demonstrate, rally or protest in the Whitman Construction Site Area in support of construction of the townhouses, the United States Marshal shall immediately notify this Court, so that the Court may consider the modification of this Order for the purpose of designating an area for such picketing, demonstration, rally, or protest, including a provision for an informational picket at each of the ten gates.

## ON MOTION FOR CLARIFICATION

Once more this Court must discuss the construction of townhouses on the Whitman Park site. Plaintiffs-intervenors A&R Development Corp./The Waterford Group and Jolly Company, Inc. (hereinafter referred to as the contractors) filed a motion seeking a clarification of this Court's Injunctive Order of April 1, 1980. The original plaintiffs and the United States concur in the contractors' reading of our Order of April 1. The contractors' motion has been opposed by the Whitman defendants.[1] This Court

---

1. The term "Whitman defendants'" as used in this Memorandum encompasses the Whitman Area Improvement Council and its successor, the Whitman Council, Inc., Alice Moore, Fred Druding, and all members of the Whitman Area Improvement Council, and the Whitman Council, Inc., and all other persons acting in concert with them or otherwise participating in their

held hearings on November 5 through November 18, 1980, at which all the parties presented testimony and oral argument.

In considering this matter, it is necessary once again to review the long history of this litigation. On November 5, 1976, this Court entered an Order directing the Philadelphia Housing Authority (hereinafter referred to as PHA), the Redevelopment Authority (hereinafter referred to as RDA), and the Department of Housing and Urban Development (hereinafter referred to as HUD), to proceed immediately to construct the townhouses on the Whitman site. The Third Circuit Court of Appeals affirmed the Order on August 31, 1977 and certiorari was denied by the United States Supreme Court on February 27, 1978. *Resident Advisory Board (RAB) v. Rizzo*, 425 F.Supp. 987 (E.D. Pa.1976), *aff'd in relevant part*, 564 F.2d 126 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Sworob v. Harris*, 451 F.Supp. 96 (E.D.Pa.1978), *aff'd*, 578 F.2d 1376, *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979).

This litigation, which commenced in 1971, has been protracted and vigorously contested. The first trial consumed 57 days, finally ending on January 21, 1976. Planning for this low income housing development commenced more than 20 years ago. The first of many public hearings took place on June 4, 1956. At this hearing various sites were considered, and after hearing the views of the community, the Whitman site at Front and Oregon Avenue was selected. The site was approved by the Philadelphia City Planning Commission.

On February 18, 1957, HUD gave tentative approval to the Whitman site for the redevelopment of a public housing project. An annual contributions contract was executed by HUD on December 6, 1957, in the amount of $8,607,793, approving a development program for Whitman of 476 units and authorizing PHA to begin planning the Whitman project. Drawings for a high-rise public housing project at the Whitman site were submitted to HUD by PHA and were approved by HUD on August 29, 1959. Condemnation and acquisition of the site by PHA took place during 1959 and 1960, culminating with the award of demolition contracts on June 26, 1960. Local opposition developed to the placing of high-rise public housing in Whitman.

On October 27, 1963, RDA executed an application to establish the Whitman Urban Renewal Area. The application sought a federal grant of $3,311,024 and a temporary loan of $5,545,524 (totaling $8,856,548) to carry on the land acquisition, relocation of site residents, demolition and site clearance, site preparation, and rehabilitation or conservation required for the proposed Whitman Urban Renewal Area. The plan included clearing 130 homes in the Whitman Urban Renewal Area which were not on the Whitman public housing site, and rehabilitating 2,500 other structures. The land use map for the Whitman Urban Renewal Area provided for public housing only on the Whitman site. The total amount of all governmental funds expended through RDA in the Whitman Urban Renewal Area from 1963 through 1975 has been $11,178,-210.43; of this amount $6,682,686.92 has constituted federal funds from HUD. Between 1969 and 1973, 109 new homes were privately developed and sold for between $25,000 and $30,000, all of which were eligible for FHA-insured mortgages. From January 1, 1966 until May 1, 1975, Whitman residents, through RDA and with the aid of federal funds, have obtained $2,718,278 in loans and grants to rehabilitate their own homes. A total of 1,123 households, more than 25% of all houses in the Whitman area, have received funds from this program.

In 1964, after opposition had developed to the high-rise design of the proposed Whitman project, a special Act of Congress was

---

aid. The Whitman Council is the organization which sought to intervene as a defendant in this litigation. *See Sworob v. Harris*, 451 F.Supp. 96 (E.D.Pa.1978). The attorney for the Whitman Council stated at the hearings culmi-

nating in this Court's Order of April 1, 1980 that he considers every resident of Whitman Park to be a member of the Council, and a defendant in this action.

passed, known as the Barrett Amendment. Pursuant to the Barrett Amendment, the design of the proposed Whitman project was changed from high-rise to low-rise construction. The zoning of the Whitman site was changed by City Council in 1964 to permit the construction of low-rise public housing on the site. In late 1967, Hartsville Construction Company was chosen as the developer to build 114 units on the Whitman site. The community opposed certain aspects of the Hartsville plan and Hartsville refused to execute the contract. Because of the opposition to the Hartsville plan, a decision was made to look for a new developer.

A HUD Equal Opportunity staff review of the Whitman site was conducted and approval of the site for low income public housing was recommended on June 4, 1968. The Whitman site was described as being located in a predominantly all-white area,[2] conducive in all respects to Equal Opportunity Housing. Thereafter, HUD approved the Whitman site. The next year HUD established the Whitman project as a "balance" for the Morton Addition, a project located in a black area of Philadelphia. The Morton Addition was completed, and is now occupied, pursuant to the agreement to build the Whitman townhouses.

During the latter part of 1969, PHA and RDA advertised for developers for the Whitman site pursuant to all applicable regulations. Twelve developers responded, and on April 28, 1970, PHA chose Multicon as the developer, which choice was approved by HUD on May 20, 1970. The Multicon proposal was considered superior to all other proposals because it maintained existing street patterns and the housing was of the same design as the other houses in the Whitman area. The Whitman Park Townhouse Project was unique in design for public housing because each house was designed with street frontage and a separate entrance and could be individually plotted on a separate building lot. This design was

in anticipation of a federal program called Turnkey III, which called for a lease-purchase agreement pursuant to which the public housing tenant could eventually become the owner of his own home.

On July 14, 1970, RDA and Multicon entered into an agreement of sale to enable Multicon to obtain the land at Front and Oregon and build the Whitman Park Townhouse Project. On October 27, 1970, Mayor Tate signed an ordinance passed by City Council approving Multicon as the development of the project. On October 29, 1970, based upon appropriate HUD approval of the project, PHA and Multicon entered into an agreement of sale whereby Multicon was to construct 120 townhouses on the Whitman site. On October 30, 1970, RDA conveyed title to the Whitman Park Townhouse Project site to Multicon.

Prior to the signing of the contracts with Multicon, the community was involved in numerous meetings and correspondence with RDA, PHA and Multicon. On June 2, 1970, a meeting was held in the Whitman community attended by officials from RDA, PHA, Multicon and the Mayor's office. The meeting was held to give the community an opportunity to closely review the Multicon plans for the Whitman Park Townhouse Project. The community made several suggestions in connection with the building materials to be used in the project and fire safety for the completed townhouses. The suggestions were accepted and appropriate changes were made in the Whitman Park Townhouse Project plans. Also, the home ownership potential and the advantages thereof of a public housing development under Turnkey III were explained to the community. Community representatives stated after the June 2, 1970 meeting that the Whitman Park Townhouse Project plans "look excellent", that they were "very impressed with the plans" and felt that the houses would be "an asset to our community."

---

2. Indeed, in 1950, 46% of the families living on the Whitman site were black, making the area an integrated section of Philadelphia.

Although a groundbreaking ceremony was conducted on December 16, 1970, actual construction did not commence until March of 1971. As a result of the activities by demonstrators at the site, the builder was unable to proceed with construction since requested police protection was not forthcoming. At a conference on April 30, 1971, the City Managing Director stated that Multicon would not receive police assistance.

Shortly thereafter, there was a series of meetings and various changes in the Whitman Park Townhouse Project were proposed in order to settle the controversy, including opening a building in the project as a community recreation area, reserving 50% of the units for persons who were displaced by the clearance for the Whitman project, raising the income levels of those persons who would be eligible for the project and setting up a screening committee, which would include Whitman residents, to assure that those living in the houses would be an asset to the community. On May 17, 1971, after full discussion and consideration of the settlement proposals, the community voted down the final settlement offer of PHA. On May 18, 1971, Mayor Rizzo was nominated as the candidate for Mayor. On May 20, 1971, the Managing Director of Philadelphia again stated that the City would not provide police assistance for Multicon should it return to work, and the Chairman of PHA stated that he had been instructed by the Mayor to order Multicon not to resume work.

After he took office in January of 1972, Mayor Rizzo told the Chairman of PHA that because of the promise he had made to the people in the Whitman area, he did not want the Whitman Park Townhouse Project to proceed. The efforts of the builder to proceed with construction were finally terminated by the City paying the builder $806,000 to cancel the construction contract.

In referring to this Court's judgment order dated November 5, 1976, our Third Circuit Court of Appeals stated:

... the court found that the City had violated the Civil Rights Act of 1866 (42 U.S.C. §§ 1981 and 1982) and the Thirteenth and Fourteenth Amendments because the actions of the City had a racially discriminatory impact and were taken with a discriminatory purpose or motivation. 425 F.Supp. at 10w24, 1025. We conclude, as did the district court, that the City violated § 1981 and § 1982 by depriving plaintiffs of constitutional rights guaranteed by the Thirteenth and Fourteenth Amendments.

\* \* \* \* \* \*

... The district court held that the City had acted with racially discriminatory intent, as evidenced by: (1) the City's joining in opposition to the Whitman Townhouse project with knowledge that some of that opposition was racially motivated; (2) Mayor Rizzo's explicit statements equating "public housing" with "Black housing" and his public stand "against placing such housing in White neighborhoods"; and (3) the City's taking steps to terminate the project with knowledge that the action would produce a racially discriminatory effect. 425 F.Supp. at 1025.

As for the actual consequences of the failure to construct the Whitman Townhouse project, the district court found the following effects of termination:

The cancellation of the Whitman Park Townhouse Project had a racially disproportionate effect, adverse to Blacks and other minorities in Philadelphia. The waiting list for low income public housing in Philadelphia is composed primarily of racial minorities. Of the 14,000 to 15,000 people on the waiting list for public housing in Philadelphia (N.T. 56–84), 85% are Black, and 95% are considered to be of racial minority background. (N.T. 40–103). Obviously those in housing projects, which are overwhelmingly Black, and those on the public housing waiting list, are those least able to move out of the poorer, racially impacted areas of Philadelphia. The evidence also established that Blacks in Philadelphia who are concentrated in the three major

Black areas of Philadelphia, have the lowest median income in comparison with the total population of Philadelphia and live in the poorest housing in Philadelphia. The Whitman Park Townhouse Project was a unique opportunity for these Blacks living in racially impacted areas of Philadelphia to live in an integrated, non-racially impacted neighborhood in furtherance of the national policy enunciated in Title VIII of the Civil Rights Act of 1968. Public Housing offers the only opportunity for these people, the lowest income Black households, to live outside of Black residential areas of Philadelphia. Cancellation of the project erased that opportunity and contributed to the maintenance of segregated housing in Philadelphia.

425 F.Supp. at 1018. This discriminatory effect and the invidious discriminatory purpose underlying the City's role in the project's termination together were found to establish a constitutional violation under *Washington v. Davis.*

\* \* \* \* \* \*

To remedy Philadelphia's violation of plaintiffs' constitutional rights, the district court ordered that the City take "all necessary steps for the construction of" and enjoined the City from interfering with, the Whitman project. 425 F.Supp. at 1029. We recognize that once a violation is found, "[t]he task is to correct, by balancing of the individual and collective interests, the condition that offends the Constitution." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16 [91 S.Ct. 1267, 1276, 28 L.Ed.2d 554] (1971). Notwithstanding the Supreme Court's observation in *Swann* that "the scope of a district court's equitable powers to remedy past wrongs is broad", *id.* at 15 [91 S.Ct. at 1275], the Supreme Court has in recent equal protection cases given careful scrutiny to the choice of remedy to assure that the relief granted is no broader than that necessary to remove the violation and its effects. *E. g., Dayton Board of Education v. Brinkman,*

433 U.S. 406, [416–420] 97 S.Ct. 2766 [2773–2775], 53 L.Ed.2d 851 (1977). *See also Rizzo v. Goode,* 423 U.S. 362, 377 [96 S.Ct. 598, 607, 46 L.Ed.2d 561] (1976). "Once a constitutional violation is found, a federal court is required to tailor 'the scope of a remedy' to fit 'the nature of the violation,' " *Brinkman, supra,* 433 U.S. at [419–20], 97 S.Ct. [2766] at 2775. In short, the federal equitable remedy must cure the constitutional defect but the dosage must not exceed that necessary to effect the cure.

Here, the injunctive relief decreed by the district court is directly responsive to and seeks to "cure" the violation proved, which arose with the City's resistance to, and obstruction of, the Whitman Townhouse project.

\* \* \* \* \* \*

In sum, therefore, it is apparent that by their actions PHA and RDA were responsible for making unavailable or denying housing, within the meaning of § 3604(a), to black families who otherwise would be living in Whitman. This discriminatory effect has not been justified under any standard, and the record bears out the need for, and propriety of, the relief granted by the district court with respect to the Whitman project.

We need comment only briefly on the form of the relief afforded by the district court in this respect. The district court was modest and conservative in the manner in which it corrected the statutory violation. Having no desire to become Philadelphia's "housing czar", *see* 425 F.Supp. at 1026, the district court required only that the construction of the Whitman project proceed as planned without further interference. In so providing, the district court did not venture outside the permissible boundaries of constitutional and statutory precepts.

564 F.2d at 140–50 (footnotes and citations omitted).

This Court's Order of November 5, 1976 provided in part:

(1) The defendants, Philadelphia Housing Authority, Redevelopment Authority

for the City of Philadelphia, City of Philadelphia, Department of Housing and Urban Development, their officers, agents, and employees shall immediately take all necessary steps for the construction of the Whitman Park Townhouse Project as planned.

\* \* \* \* \* \*

(4) All parties to this litigation are enjoined from taking any action which will interfere in any manner with the construction of the Whitman Park Townhouse Project.

425 F.Supp. at 1029.

The judgment of this Court was affirmed by the Third Circuit, with one exception. Since this Court had found no statutory or Constitutional violations on the part of the Whitman defendants, the Third Circuit reversed that part of this Court's Order which enjoined the Whitman defendants from interfering in any manner with the construction of the townhouses. The Third Circuit stated, however, that this Court could modify its Order in the event that the Whitman defendants, at some time in the future interfered with construction of the townhouses.

On April 1, 1980, this Court, after hearing, determined that the Whitman defendants' threats and attempts to interfere with the construction of the townhouses required an Order enjoining them from engaging in activities which would in any way interfere with the construction of the townhouses. In our Memorandum accompanying the Order of April 1, 1980, the Court found that "members of the Whitman Council and persons acting in concert with them have interfered with construction and intend to continue to interfere with construction by threats, physical violence, intimidation, and coercion directed toward those engaged in construction . . . ." *RAB v. Rizzo*, Nos. 71–1575, 81–0419 (D.Pa. March 23, 1981). In its Order of April 1, 1980, the Court prohibited picketing, protesting, rallying, demonstrating or similarly assembling in the construction area except that one informational person could stand at each of the ten gates to the Whitman Construction Site; all other picketing, demonstrations, rallies, protests or similar assemblies in the Whitman Construction Site Area were confined to the barricaded sidewalk area on the east side of Front Street between Oregon Avenue and Shunk Street. The April 1 Order specifically provided that each informational person may peacefully converse with persons entering or leaving the Whitman Construction Site provided that such conversations be limited to 60 seconds in duration and provided that persons who do not wish to stop or converse with the informational person may freely pass. This Court's April 1 Order also enjoined the Whitman defendants from blocking or attempting to block any street or access route in or to the Whitman Construction Site; causing or attempting to cause any damage or harm to persons, property or materials in any manner connected with construction at the Whitman Site; entering the construction site without the express permission of the person in charge of construction or of the United States Marshal or his Deputy at the Site; preventing or attempting to prevent by any means any person or vehicle having lawful business with A&R Development or Jolly Company from freely entering or leaving the Site; using or attempting to use any means to coerce, threaten or intimidate A&R Development or Jolly Company or their employees or others having lawful business on the Site from going upon or leaving the Site or doing business with them; preventing or attempting to prevent by any means at any location deliveries and shipments of materials intended for use at the construction Site; engaging in physical obstruction, violence, intimidation or coercion, or threats thereof, directed toward A&R Development, Jolly Company or their subcontractors or their employees; seizing, restraining, or damaging any personal or real property of A&R Development or Jolly Company or any of their subcontractors or employees; encouraging or inducing others to engage in any of the above activities.

This Court's Order of April 1, 1980 was appealed by the Whitman defendants but

the appeal was withdrawn. The records in this Court show that on June 3 and 4, 1980, seventy of the Whitman defendants were arrested and charged with criminal contempt for violating this Court's Order.

The motion now before the Court requests clarification as to whether the Order of April 1, 1980 covers the following:

1. Those provisions prohibiting the use of any means to coerce, threaten or intimidate A&R Development Co., Jolly Co. or others having lawful business upon the Whitman Construction Site or the employees of the aforesaid are deemed to preclude the use of loudspeakers or other amplification systems by defendant WAIC and all others conspiring, acting in concert or otherwise participating with them or acting in their aid or behalf.

2. The prohibition of picketing, protesting, rallying, demonstrating or similarly assembling in the Whitman Construction Site area except in designated areas is deemed to preclude individuals, singly or in groups, from moving or standing on the sidewalks or streets immediately adjacent to the fence surrounding the Project site.

3. The provision in paragraph 1(a) of the Order of April 1, 1980 authorizing the United States Marshal or his Deputy at the Site to designate a passageway shall be deemed to authorize the United States Marshal or his Deputy at the Site to paint two pairs of lines on Shunk Street perpendicular to the curb lines on Shunk Street to connect the north and south curbs of Shunk Street at the points at which Hancock Street and Howard Street intersect Shunk Street or in any other manner to designate the passageway referred to in paragraph 1(a) of the Order of April 1, 1980.

4. The "passageway" referred to in paragraph 1(a) of the Order of April 1, 1980 is deemed to include the entire area within such pairs of lines.

At the hearing the motion was amended to seek a clarification as to whether the Order prohibited the use of "fighting words" as a means of protest at the Whitman jobsite. (N.T. 2:540).

For the reasons hereinafter set forth the Court has determined that its Order of April 1, 1980 prohibits the use of amplification equipment by the Whitman defendants in the Whitman Construction Site Area (that area enclosed by the dotted line on the plan attached hereto) between the hours of 7:30 a. m. and 4:00 p. m., Monday through Friday, until construction of the townhouses is completed. The Court is also of the opinion that the April 1st Order prohibits the use of fighting words by the Whitman defendants directed to persons working on the Whitman Construction Site or having lawful business thereon. In addition, the Court has determined that the April 1st Order clearly authorizes the United States Marshal or anyone designated by him to paint lines designating the passageway at each gate to the construction site. Finally, the Court has determined that its Order prohibits protesting and demonstrating in the areas adjacent to the fence surrounding the construction site because the Order clearly prohibits all protesting and demonstrating in the Whitman Construction Site Area other than in the designated barricaded sidewalk area, with one informational person allowed at each gate.

## FACTS

The Court makes the following factual findings on the basis of the evidence presented at the hearings held from November 5 through November 18, 1980. The Whitman Park townhouses are being built in South Philadelphia on a site comprising approximately two city blocks bounded by Porter Street to the north, Oregon Avenue to the south, Front Street to the east, and midway between Second Street and Hancock on the west. Since on or about August 1, 1980, the Whitman defendants have operated an electronic amplification system from the barricaded sidewalk area on the east side of Front Street between Oregon Avenue and Shunk Street. (N.T. 2:374). Their loudspeakers are mounted on a pole at the southeast corner of Front and Shunk Streets and face the Whitman jobsite. (N.T. 1:16, 56; N.T. 2:747). This amplification system operates continuously throughout the workday. (N.T. 2:20, 137).

The broadcasts over the Whitman defendants' amplification system during working hours have been so loud that the workers, when communicating instructions concerning work operations, frequently must resort to using hand signals (and on some occasions written instructions) in situations where they normally would communicate by speech. (N.T. 2:84–85; 133–36; 173–78). The noise levels from the Whitman defendants' amplification system affect the workers' ability to hear backup signals on vehicles moving on the construction site and thus constitute a safety hazard. (N.T. 1:178–79). One of the workers injured his hand during a concrete pour at the construction site because an order to the driver of the concrete truck to pull forward was countermanded by the Whitman defendants over their loudspeaker telling the driver to "back up" and the truck driver, distracted, put the truck in reverse. (N.T. 2:29–31). The concrete work is behind schedule, in part because harassment over the Whitman defendants' amplification system is diminishing the efficiency of the workers. (N.T. 2:35).

Edward M. Clark, a professional engineer who testified as an expert on the measurement of sound, produced tape recordings he made at the Whitman jobsite on October 3, 1980 of the sounds broadcast over the Whitman defendants' amplification system, and the tapes were admitted into evidence. Excerpts from those tape recordings were played for the Court at the hearing. Each excerpt lasted one minute and, as Clark testified, was picked at random to give a representative sampling of the programs broadcast over the Whitman defendants' loudspeaker system at the noise level one would hear if standing 100 feet from the demonstrators' speakers. The Court finds, as testified by Clark, that there were workers standing closer than 100 feet from the speakers. The Court also finds that the noise level as reproduced for it during the hearing was such that exposure of more than one minute would be irritating, distracting, and would reduce concentration significantly.

The Court has listened to all the tapes introduced into evidence and finds that they do not contain any communication protected by the First Amendment. The noises amplified and directed to the ears of those working at the construction site include a recording which the workers call the "Star Wars" tape. It consists of loud, intense, piercing sounds such as those used to produce apprehension of total destruction in outer space motion pictures. The amplified noise also includes a recording of high-pitched siren-like sounds, a recording of a male voice repeatedly shouting the word "scab", and a recording of laughing sounds. These tapes are played continuously during working hours except for those periods when there are live broadcasts by both male and female voices calling the workers' names and commenting in a belittling manner on the jobs the workers are performing. The Court finds that noises like those on the "Star Wars" tape and the siren tape startle and distract the workers and adversely affect safety and productivity at the jobsite. Calling out the workers' names and other information personal to the workers over the loudspeaker also distracts the workers, thereby decreasing productivity and increasing the risk of accidents. Lewis S. Goodfriend, a professional engineer who testified as an expert on the effect of noise on human beings, was asked by the Court:

> If you were retained in your capacity as an expert to recommend the type of broadcasts which should be used for the purposes of slowing down or interfering with construction at the Whitman Park site, what type of broadcasts would you recommend?

Goodfriend replied:

> Very similar to the Star Wars and whistle tapes, and I will say that that is the kind of sounds that we developed in World War II for this purpose.
>
> Also, I would use propaganda techniques of name calling. I would intersperse these. I would attempt to produce startle and speech interference.

(N.T. 1:195–96).

Thomas Myrick, security coordinator and office manager for Jolly Company at the

Whitman Construction Site, made tape recordings on September 19, 1980 of a Whitman broadcast of a male voice, identified as the voice of John Senick, a resident of the Whitman area who admitted to speaking daily over the amplification system, and a female voice, identified as the voice of Patricia Egger, an officer of the Whitman Council (N.T. 2:207–16). In this broadcast a steel truck driver making a delivery to the Whitman jobsite was told that he would be identified to other Teamsters as a scab because he had crossed the Whitman defendants' "picket line", that he better be sure that he had a police escort out of the Whitman area and once he reached the state line he was on his own, and that he had better keep looking over his shoulder because there were a lot of Teamsters on the highway. (Jolly Exhibit 15, sides 1 and 2; Jolly Exhibit 16, side 2; Jolly Exhibit 17, side 1).

The Court finds that prospective subcontractors, including a plumbing contractor, an electrician, a fencing company, and two trash removal companies, were threatened over the Whitman defendants' amplification system and as a result thereof they would not work at the jobsite. (N.T. 2:222–23). In addition, the Whitman defendants have attempted to prevent subcontractors from working on the Whitman job by making threatening telephone calls. (N.T. 2:166–67; 314–22; 639). The Court also finds that voices on the Whitman defendants' loudspeaker have asked individual workers how many children they have and if they know where their children are. (N.T. 2–87). Names, addresses and job titles of employees of Ashler Construction Company, the concrete subcontractor at the construction site, were read over the loudspeaker, apparently from a copy of Ashler's certified payroll because the information read corresponded exactly to that on the payroll. (N.T. 2:140–44; 180–84; 225–26). Workers testified that they had heard names and addresses of employees read

over the loudspeaker, and that such incidents were disturbing and threatening to all of the employees. (N.T. 2:24–27; 107–08; 355–56).

Lewis Goodfriend, one of the contractors' expert witnesses, visited the Whitman construction site on October 20, 1980 and took noise level readings while he was on the site. The Court finds, as testified by Goodfriend, that the noise levels from the broadcasts over the Whitman defendants' amplification system were consistently in the range of 80 to 84 db(A).[3] According to standards established by the American National Standards Institute, reliable face to face verbal communication cannot take place at a distance of 3 to 5 feet in the presence of noise measuring 83 db(A) or above, at distances of 8 feet in the presence of noise measuring 75 db(A) or above, or at distances of 20 to 25 feet in the presence of noise measuring 65 db(A) or above; if the speakers are not standing face to face, the decibel level at which reliable communication can take place at any specified distance is reduced by 5 decibels. (N.T. 1:165–67). Verbal communication between workers on the Whitman Site takes place over distances ranging from 1 or 2 feet to 8 to 10 feet apart. (N.T. 1:171). Goodfriend stated that even on construction sites where noisy equipment is operating, sound levels are sufficiently low throughout most of the site to permit verbal communication at distances of 6 to 10 feet. (N.T. 1:243). When speech communication is difficult on a worksite, productivity is lower because more time is consumed giving instructions and more errors are made. (N.T. 1:152).

The contractors' expert, Edward M. Clark, stated that he visited the Whitman construction site on October 3, 1980 and took noise level readings while on the site. The Court finds, as testified by Clark, that the noise level at the site, exclusive of the Whitman defendants' amplification system,

---

**3.** The unit of sound measurement is the decibel, and the "A" scale is used by many federal and state agencies in regulating and evaluating noise. The A-weighted sound scale, which is abbreviated db(A), has been found to correlate reasonably well with hearing loss and with human response to noise in general. (N.T. 1:61). A noise which is 10 db(A) higher than another noise is twice as loud to the ear. (N.T. 1:95–96).

usually measured between 55 and 60 db(A) with a peak of 72 db(A). (N.T. 1:64–67). The piledriving equipment operating on the site increases this level for periods of approximately 5 minutes each, totaling approximately 20 minutes a day. (N.T. 2:83). Clark measured the noise level from the Whitman defendants' amplification system at a maximum of 86 db(A) and a typical reading of 80 db(A) while the "scab" tape was played; at a maximum of 85 to 86 db(A) while the "Star Wars" tape was played; at a typical reading of 70 to 80 db(A) while the tape of a siren-like sounds (called "whistles and tones" by Clark) was played; and at maximum levels of 80 to 89 db(A) during live broadcasts by male and female voices. (N.T. 1:71–72; 77–79; 85–86; Jolly Exhibits 2, 4, 5, 6, 7, 8, 10, 11). The "ambient"[4] noise on the construction site, including normal construction noises, which usually measured between 55 and 60 db(A), for the most part did not contribute to the noise level on the site because it usually was 10 db(A) or more below the noise from the Whitman defendants' amplification system, and sounds which are 10 db(A) or more below the noise source being measured are acoustically drowned out. (N.T. 1:68–69). The Court finds that the noise levels from the Whitman defendants' amplification system, as well as the content of the broadcasts, adversely affect productivity and safety on the Whitman construction site. (N.T. 1:189–92; 226).

The Court finds, as testified by employees of Jolly Company and its subcontractors, that demonstrators standing near the fence surrounding the construction site spit on workers, squirt water on them, shout racial slurs at them, and direct other "fighting words" at them. (N.T. 2:132; 171; 236; 328, 332; 496–97). Black workers are called "nigger", "black motherfucker", "faggot", "scabbo" and "punk" by demonstrators near the fence or at the gate and are called "boy" by demonstrators over the loudspeak-er (N.T. 2:8–15; 18–20; 89–93; 138; 326–32), and white workers are called "motherfucker", "white nigger", "white trash", "nigger lover", "faggot", "scab" and "queer". (N.T. 2:129–33; 232–35; 350–54; 658–60). The Court finds the testimony of John Hall, an employee of Burns Detective Agency at the site, credible. Hall testified that in the course of his security duties at the Whitman jobsite he had been called "nigger bastard", "scabby", "dwarf", "50-cent prostitute" and "black motherfucker". He testified that on one occasion when he was standing near one of the gates Michael Sowicz, Jr., a regular demonstrator, called him "scabby", "nigger", "dwarf" and "50-cent prostitute" and tried to spit on him, whereupon Mr. Hall threw a handful of dirt at Mr. Sowicz. Mr. Sowicz then came around the gate with a stick in his hands and threatened to kill Mr. Hall, who had picked up two bricks, but the police arrived in time to avert further violence. (N.T. 2:328–29).

A protestor known as "Cookie Monster" threatened to kill Edward Stoffa, the project superintendent for Jolly Company at the Whitman jobsite. (N.T. 2:671–74). Patricia Egger, an officer of the Whitman Council, has taunted workers by suggesting that they engage in sex with their mothers. (N.T. 2:351–52; 360; 660). Some workers have responded to the protestors by making obscene gestures, although they have been warned by Jolly Company not to respond in any way to the taunts of the protestors on penalty of losing their jobs.[5] (N.T. 2:37–38; 151; 220–221; 331; 354). Jolly Company has discharged workers involved in incidents with the protestors. (N.T. 2:276–77; 686).

### I. The Loudspeaker Issue

The contractors, the plaintiffs, and the United States contend that the Court's Order of April 1, 1980 prohibits the above-described use of the Whitman defendants' amplification system. They point out that the

---

4. "Ambient" noise is the noise from all sources other than the source being measured. It includes, in addition to continuous background noise, transient sounds such as an airplane passing overhead or a piledriver in operation. (N.T. 1:62–69).

5. To prevent violent confrontations, the contractors and subcontractors should immediately advise all workers that the instruction not to respond to the protests includes a prohibition of making obscene gestures.

Order as written prohibits the use of any means to coerce, threaten or intimidate workers at the construction site and others having lawful business on the site. The Court finds that the Whitman defendants' amplification system has been used during working hours for the sole purpose of harassing, threatening and intimidating the contractors and their employees and others having lawful business on the site from going upon or leaving the site or doing business on the site. The amplification system is seldom, if ever, used during work hours to communicate any constitutionally protected message.

In our Memorandum accompanying our Order of April 1, 1980, we found that the Whitman defendants had interfered with construction and intended to continue to interfere with construction by threats, physical violence, intimidation, and coercion directed toward those engaged in construction, and by using similar means to prevent the delivery of equipment and construction materials to the site. The Court now finds that this pattern of conduct has continued with the use of the amplification system and that this Court's Order of April 1, 1980 prohibits the use by the Whitman defendants of loudspeakers, bullhorns or other amplification systems in the Whitman Construction Site Area during working hours (7:30 a. m. to 4:00 p. m., Monday through Friday) until construction of the townhouses is completed.

This Court's Order of April 1, 1980 was based upon the powers inherent in a court to prohibit deliberate interference with a valid judgment. *RAB v. Rizzo*, Nos. 71–1575, 81–0419 (D.Pa. March 23, 1981); see *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); *United States v. State of Washington*, 459 F.Supp. 1020, 1115 (D.Wash.1978). The Court held hearings in March of 1980 and found that the Whitman defendants were interfering

and intended to continue to interfere with the construction of the townhouses as ordered by this Court. *RAB v. Rizzo*, Nos. 71–1575, 81–0419 (D.Pa. March 23, 1981).

As we noted in our Memorandum accompanying our Order of April 1, 1980, a court has broad equitable powers to order an effective remedy and to insure its implementation. *Hills v. Gautreux*, 425 U.S. 284, 297–98, 96 S.Ct. 1538, 1546–47, 47 L.Ed.2d 792 (1976); *Swann v. Charlotte-Mecklenburg Board of Ed.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). An injunction seeks not only to eliminate past wrongdoing, but also to prevent its recurrence. *United States v. W. T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Swift & Co. v. United States*, 276 U.S. 311, 326, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 951 (2d Cir. 1978). Neither private persons nor government officials can nullify this Court's ruling, as affirmed by the Court of Appeals and the United States Supreme Court,[6] that the Constitutional violations found in this case require the construction of the townhouses as planned, *Cooper v. Aaron, supra*, 358 U.S. at 17–18, 78 S.Ct. at 1409; *see also RAB v. Rizzo*, 463 F.Supp. 694, 700 (E.D.Pa.1979).

The Whitman defendants argue that a prohibition on their use of the amplification system unjustifiably limits their First Amendment rights. As this Court has found on the basis of the evidence presented at the November hearing, the amplification system is being used for the sole purpose of harassing, threatening and intimidating the contractors and their employees and others having lawful business on the site from going upon or leaving the site or doing business on the site. Such use of the amplification system is not protected by the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). "It is not plausible to uphold the use of words as projectiles where no exchange of views is involved."

---

**6.** *RAB v. Rizzo*, 425 F.Supp. 987 (E.D.Pa.1976), *aff'd in relevant part*, 546 F.2d 126 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Sworob v. Harris*, 451

F.Supp. 96 (E.D.Pa.1978), *aff'd*, 578 F.2d 1376 (3d Cir. 1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979).

L. Tribe, *American Constitutional Law* at 605 (1978).

■ We deal here with a specific use of loudspeakers which significantly interferes with the construction of the Whitman Park townhouses, and the sole immediate object of which is to prevent the effectuation of our prior judgment in this case. As the Court has found, the Whitman defendants were not using the amplification system during the hours of work at the construction site for constitutionally protected communication. Furthermore, demonstrations and protests designed to prevent effectuation of a valid court order are not constitutionally protected speech and may be enjoined. In *Pickens v. Okolona Municipal Separate School District*, 594 F.2d 433 (5th Cir. 1979), a case involving demonstrations by black students and parents intended to induce a black boycott of the Okolona High School on account of certain grievances of black students, the court held that the district court was justified in enjoining the demonstrations during school hours in the vicinity of the high school which was being integrated under court order. The protestors there sought by intimidation, threats, and coercion to force all black students to cease attending Okolona schools, and their raucous behavior was found to have interfered significantly with the continued desegregation of the school system. Similarly, in *Kasper v. Brittain*, 245 F.2d 92 (6th Cir.), *cert. denied*, 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), the court rejected a First Amendment challenge to a sentence for contempt for violation of an injunction against the appellant's interfering by words, acts or otherwise with the court-ordered desegregation of public schools in Anderson County, Tennessee. The appellant had urged a crowd to disregard the desegregation orders of the court and to continue pressure upon school officials until blacks were eliminated from the local high school. The court characterized appellant's speech as advocacy of immediate action to accomplish an illegal result rather than a mere exposition of ideas. *Id.* at 95–96. The instant case is analogous in that the use of amplification equipment by the Whitman

defendants in the vicinity of the Whitman Construction Site is intended to intimidate and harass persons working on the site with the object of preventing construction of the townhouses, rather than to convey to willing listeners the Whitman defendants' views on public housing.

The workers at the Whitman jobsite are a captive audience, who must remain on the jobsite during the workday and, for security reasons, even during their lunch break. Unlike the users of public transportation in *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), who could avoid offensive political advertising by averting their eyes, *id.* at 320, 94 S.Ct. at 2725. (Brennan, J., dissenting), the workers at the Whitman jobsite are powerless to avoid bombardment by derisive speech and noise from the Whitman defendants' amplification system short of giving up their jobs. As several of the workers testified, the harassment by the demonstrators has been such that they would have quit the job except that there was no other work available to them.

■ The Court's holding herein that its Order prohibits the Whitman defendants from using their amplification system is limited to use of the system in the Whitman Construction Site Area during working hours. As noted in the Court's Memorandum accompanying its Order of April 1, 1980, it has long been recognized that the First Amendment permits reasonable regulation of the time, place and manner of picketing and other forms of expression in order to further significant governmental interests. *Cox v. New Hampshire*, 312 U.S. 569, 575–76, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). The Supreme Court has consistently upheld reasonable "time, place and manner" restrictions. *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (ban on demonstrations in vicinity of jail); *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (limitation on the use of sound trucks). In *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Court upheld an ordinance which

prohibited a person while on grounds adjacent to a building in which a school is in session from wilfully making a noise or diversion which disturbed the good order of the school session. The Court, in holding that the ordinance in question was not overbroad, stated that the "crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Id.* at 116, 92 S.Ct. at 2303. The Court held that the ordinance, which punished only conduct which disrupts or is about to disrupt normal school activities, did not unnecessarily interfere with First Amendment rights. In the instant case, we have found that the use of the amplification system by the Whitman defendants adjacent to the Whitman jobsite is interfering with construction of the townhouses as ordered by this Court and that a limitation on the use of the amplification system during work hours in the Whitman Construction Site Area is necessary to effectuate the injunction that the townhouses be constructed.

The Whitman defendants claim that they are opposed to the construction of the townhouses because the people in the Whitman area are opposed to the government financing the construction of houses for the poor. They emphasize that the cost of constructing the Whitman Park townhouses is now substantially in excess of the original development cost of $24,421[7] per house. The Court understands that most citizens are sincerely concerned with the spiralling costs of construction brought about by inflation. In connection with the Whitman Park houses, however, as the record in this litigation reveals, the actions of the Whitman defendants in threatening and harassing contractors, subcontractors and suppliers has been a greater factor than inflation in escalating the construction costs at Whitman Park. In a case such as this where the Court has found that the actions of municipal and federal defendants in terminating the original construction contract amounted to statutory and constitutional violations, the escalated cost brought about by inflation and the actions of the Whitman defendants does not excuse the violation of a judicial order designed to remedy the constitutional and statutory violations.

The injunctive order in this case does not in any manner interfere with the right of the Whitman defendants to express their protests to the public and to those legislative and administrative bodies whom they consider responsible for the housing and welfare programs which in their opinion are objectionable. Furthermore, the Order of April 1, 1980 specifically permits the Whitman defendants to station one informational person at each of the ten gates to the construction site to convey their message to persons entering or leaving the site. The area and time limitations on the Whitman defendants' use of an amplification system are necessary and reasonable to prevent interference with construction and to enable construction to proceed without episodes of violence.

On the basis of the foregoing, we conclude that the prohibition of the use of loudspeakers, bullhorns or other amplification systems by the Whitman defendants in the Whitman Construction Site Area during the hours when construction work is in progress, including the workers' lunch period, does not, in any manner, contravene the First Amendment rights of the Whitman defendants. Therefore, an Order will be entered declaring that this Court's Order of April 1, 1980 prohibiting the use of any means to coerce, threaten or intimidate any person working on the Whitman Construction Site or having lawful business thereon precludes the use of loudspeakers, bullhorns or other amplification systems by the Whitman defendants in the Whitman Construction Site Area during the hours of 7:30 a. m. to 4:00 p. m., Monday through Friday, until construction of the townhouses is completed.

## II. *Demonstrating at the Fence Adjacent to the Whitman Construction Site*

The contractors ask us to declare that the prohibition of picketing, protesting, rally-

---

**7.** N.T. 2:8, Plaintiff's Exhibit 1, *RAB v. Rizzo*, 425 F.Supp. 987 (E.D.Pa.1976).

ing, demonstrating or similarly assembling in the Whitman Construction Site Area except in the designated areas, precludes individuals, singly or in groups, from moving or standing on the sidewalks and streets immediately adjacent to the construction site. The Court's Order does not prohibit the Whitman defendants from moving or standing on the sidewalks and streets immediately adjacent to the construction site. However, the Court's Order not prohibit picketing, protesting, rallying, demonstrating, or similarly assembling on the sidewalks and streets immediately adjacent to the construction site. Therefore, to the extent that moving or standing on the sidewalks and streets immediately adjacent to the construction site, even by one individual, constitutes a protest or demonstration against the construction of the townhouses, it is already clearly prohibited by this Court's Order of April 1, 1980 wherein we limited the area for demonstrating and protesting to the barricaded sidewalk area on the east side of Front Street between Oregon Avenue and Shunk Street with one informational person permitted at each gate to the construction site.

### III. *Prohibition on the Use of "Fighting Words" by Demonstrators*

█ The Court heard considerable testimony on the use by demonstrators of obscene language and racial slurs directed at workers on the Whitman jobsite. The Court has found that black workers are called "nigger," "boy," "black motherfucker," "faggot," "scabbo," and "punk," and that white workers are called "motherfucker," "white nigger," "white trash," "nigger lover," "faggot," "scab," and "queer." In the atmosphere of hostility and tension at the Whitman Construction Site these words, and others like them, have a direct tendency to cause acts of violence by the person to whom, individually, they are addressed, and thus are "fighting words." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 573, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942). Probably the most frequently used derisive name called the workers is "scab" or "scabbo."[8] Al-

though the Whitman defendants are representing to the public that they are manning a labor picket line, it is obvious from the record in this case that the Whitman defendants are not engaged in a labor dispute by protesting the construction of the townhouses. Since there is no labor dispute and no labor picket line at the Whitman site, there is no basis on which the demonstrators can justify calling the workers "scabs." Although the word "scab" may not be a fighting word in the context of some labor disputes, the terms "scab" and "scabbo" are fighting words in the atmosphere of tension which exists at the Whitman Construction Site where there is no labor dispute.

Although the workers at the Whitman jobsite have been warned not to respond in any way to the taunts of the demonstrators, and Jolly has discharged employees involved in even minor incidents with the demonstrators (N.T. 2:276–77), the use of fighting words by the Whitman defendants at the construction site has precipitated episodes of violence. One security guard, out of fear and frustration, responded physically to threats and taunts by one of the demonstrators. (N.T. 2:328–29). The Court is concerned with the potential for violence in confrontations between demonstrators and workers on the jobsite. As we pointed out in our Memorandum accompanying our Order of April 1, 1980, a history of tension or violence does not excuse the denial of civil rights, but it does justify the adoption of measures which will permit construction to proceed without violence or other impediment. Any activity that may threaten human life may be enjoined on the ground that a court of equity will not gamble with human life, at whatever odds, and on the ground that for loss of life there is no remedy that is, in an equitable sense, adequate. *Harris Stanley Coal & Land Co. v. Chesapeake & Ohio Ry. Co.*, 154 F.2d 450 (4th Cir.), *cert. denied*, 329 U.S. 761, 97 S.Ct. 111, 91 L.Ed. 656 (1946). Therefore, this Court has determined that the provisions in its Order of April 1, 1980 prohibiting the use of any means to coerce, threaten or

---

8. A black worker testified that he understood "scabbo" to mean a black scab. (N.T. 2:90).

intimidate any person working on the Whitman Construction Site or having lawful business thereon preclude the use by the Whitman defendants of fighting words directed to any person working on the jobsite or having lawful business thereon. Such fighting words are not speech protected by the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution...." *Cantwell v. Connecticut*, 310 U.S. 296, 309–10, 60 S.Ct. 900, 905–06, 84 L.Ed. 1213 (1940).

### IV. *The Painting of Lines at the Whitman Park Gates*

In paragraph 1(a) of its Order of April 1, 1980, the Court authorized the United States Marshal or his Deputy at the Whitman Construction Site to designate a passageway at each gate to the construction site outside which one informational person was allowed to stand. The court intended that the United States Marshal or his Deputy designate such passageway in any reasonable manner, including the painting of two pairs of lines on Shunk Street perpendicular to the curb lines on Shunk Street to connect the north and south curbs of Skunk Street at the points at which Hancock Street and Howard Street intersect Shunk Street.

Accordingly, an appropriate Order will be entered. This Memorandum is in Lieu of Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).