RESIDENT ADVISORY BOARD et al.

v.

Frank L. RIZZO et al.

Civ. A. No. 71–1575.

United States District Court,
E. D. Pennsylvania.

Jan. 11, 1979.

Jonathan M. Stein, Harold R. Berk, Community Legal Services, Philadelphia, Pa., for Resident Advisory Bd.

Charles W. Bowser, Philadelphia, Pa., for Urban Coalition.

Joseph M. Gindhart, Philadelphia, Pa., for Whitman Council.

John R. Padova, Solo, Padova & Lisi, Philadelphia, Pa., for Sheldon Albert, et al.

Mark W. Jurikson, Asst. City Sol., Philadelphia, Pa., for City.

William F. Hall, Jr., Dept. of HUD, Philadelphia, Pa., for HUD.

Harold Cramer, Arthur W. Lefco, Philadelphia, Pa., for Phila. Housing Authority.

Peter A. Galante, Nicholas J. Scafidi, Philadelphia, Pa., for Redevelopment Authority.

Roberta Staats and Arthur R. Littleton, Philadelphia, Pa., for Multicon.

Walter S. Batty, Jr., Asst. U. S. Atty., Philadelphia, Pa., for the U. S. Government.

Benjamin Paul, Philadelphia, Pa., for Councilman James J. Tayoun.

Warren R. Hamilton, Philadelphia, Pa., for Councilman Cecil B. Moore.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

On December 21, 1978, the City Council of Philadelphia considered Bill No. 1706, entitled "An ordinance approving the redevelopment contract of the Redevelopment Authority of the City of Philadelphia for the redevelopment and urban renewal of a portion of Whitman Urban Renewal Area . . .". Bill No. 1706 failed to receive sufficient affirmative votes. On the same day, City Council passed a resolution "Requesting the Redevelopment Authority of Philadelphia to prepare plans and select a redeveloper for the development of not less than 250 dwelling units on scattered sites within the Whitman Urban Renewal Area under certain terms and conditions." This Court has considered plaintiffs' motion requesting, among other things, that this Court order the defendants, Philadelphia Housing Authority (PHA) and Philadelphia Redevelopment Authority (RDA), to execute by January 15, 1979 all necessary contracts and agreements with A & R Development Corp./The Waterford Group, Inc. The Department of Housing and Urban Development (HUD) joined the plaintiffs in requesting such an Order. The defendant, City of Philadelphia, has opposed this motion and requests the Court to change the judgment order of November 5, 1976 to provide for scattered site housing instead of the townhouses. For the reasons hereinafter set forth, this Court has determined that plaintiffs' motion shall be granted and the motion of the defendant, City of Philadelphia, shall be denied. This means that the execution of the contract with the selected redeveloper, and all other steps necessary for the construction of the townhouses as planned, shall proceed immediately.

## HISTORY OF LITIGATION

The history of this litigation has been recited in detail in prior opinions of this Court. A summary at this juncture should be helpful, however, in clarifying the issues, since a review of the transcript of the proceedings before City Council indicates that the real issues were somewhat clouded by the rhetoric of the hearing.

On November 5, 1976, this Court entered an order directing the PHA, the RDA and HUD to proceed immediately to construct the townhouses on the Whitman site. The Third Circuit Court of Appeals affirmed the order on August 31, 1977 and certiorari was denied by the United States Supreme Court on February 27, 1978. *Resident Advisory Board (RAB) v. Rizzo,* 425 F.Supp. 987 (E.D. Pa.1976), *aff'd in relevant part,* 564 F.2d 126 (3d Cir. 1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Sworob v. Harris,* 451 F.Supp. 96 (E.D.Pa.1978), *aff'd,* 578 F.2d 1376, *cert. denied,* —— U.S. ——, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979).

This litigation, which commenced in 1971, has been protracted and vigorously contested. The trial consumed 57 days, finally ending on January 21, 1976. Planning for this low income housing development commenced more than 20 years ago. The first of many public hearings took place on June 4, 1956. At this hearing, various sites were considered, and after hearing the views of the community, the Whitman site at Front and Oregon was selected and the site was approved by the Philadelphia City Planning Commission.

On February 18, 1957, HUD gave tentative approval to the Whitman site for the redevelopment of a public housing project. An annual contributions contract was executed by HUD on December 6, 1957, in the amount of $8,607,793, approving a development program for Whitman of 476 units and authorizing PHA to begin planning the

Whitman project. Drawings for a high-rise public housing project at the Whitman site were submitted to HUD by PHA and were approved by HUD on August 29, 1959. Condemnation and acquisition of the site by PHA took place during 1959 and 1960, culminating with the award of demolition contracts on June 26, 1960. Local opposition developed to the placing of high-rise public housing in Whitman.

On October 27, 1963, RDA executed an application to establish the Whitman Urban Renewal Area. The application sought a federal grant of $3,311,024 and a temporary loan of $5,545,524 (totaling $8,856,548) to carry out the land acquisition, relocation of site residents, demolition and site clearance, site preparation, and rehabilitation or conservation required for the proposed Whitman Urban Renewal Area. The plan included clearing 130 homes, none of which were at the Whitman public housing site, and rehabilitating 2,500 other structures. The land use map for the Whitman Urban Renewal Area provided for public housing only on the Whitman site. The total amount of all governmental funds expended through RDA in the Whitman Urban Renewal Area from 1963 through 1975 has been $11,178,210.43; of this amount $6,682,-686.92 has constituted federal funds from HUD. Between 1969 and 1973, 109 new homes were privately developed and sold for between $25,000 and $30,000, all of which were eligible for FHA-insured mortgages. From January 1, 1966 until May 1, 1975, Whitman residents, through RDA and with the aid of federal funds, have obtained $2,718,278 in loans and grants to rehabilitate their own homes. A total of 1,123 households, more than 25% of all houses in the Whitman area, have received funds from this program.

In 1964, after opposition had developed to the high-rise design of the proposed Whitman project, a special Act of Congress was passed, known as the Barrett Amendment. Pursuant to the Barrett Amendment, the design of the proposed Whitman project was changed from high-rise to low-rise construction. The zoning of the Whitman site was changed by City Council in 1964 to permit the construction of low-rise public housing on the site. In late 1967, Hartsville Construction Company was chosen as the developer to build 114 units on the Whitman site. The community opposed certain aspects of the Hartsville plan and Hartsville refused to execute the contract. Because of the opposition to the Hartsville plan, a decision was made to look for a new developer.

A HUD Equal Opportunity staff review of the Whitman site was conducted and approval of the site for low income public housing was recommended on June 4, 1968. The Whitman site was described as being located in a predominantly all-white area,[1] conducive in all respects to Equal Opportunity Housing. Thereafter, HUD approved the Whitman site. The next year HUD established the Whitman project as a "balance" for the Morton Addition, a project located in a black area of Philadelphia. The Morton Addition was completed, and is now occupied, pursuant to the agreement to build the Whitman townhouses.

During the latter part of 1969, PHA and RDA advertised for developers for the Whitman site pursuant to all applicable regulations. Twelve developers responded, and on April 28, 1970, PHA chose Multicon as the developer, which choice was approved by HUD on May 20, 1970. The Multicon proposal was considered superior to all other proposals because it maintained existing street patterns and the housing was of the same design as the other houses in the Whitman area. The Whitman Park Townhouse Project was unique in design for public housing because each house was designed with street frontage and a separate entrance and could be individually plotted on a separate building lot. This design was in anticipation of a federal program called Turnkey III, which called for a lease-pur-

---

1. Indeed, in 1950, 46% of the families living on the Whitman site were black, making the area an integrated section of Philadelphia.

chase agreement pursuant to which the public housing tenant could eventually become the owner of his own home.

On July 14, 1970, RDA and Multicon entered into an agreement of sale to enable Multicon to obtain the land at Front and Oregon and build the Whitman Park Townhouse Project. On October 27, 1970, Mayor Tate signed an ordinance passed by City Council approving Multicon as the developer of the project. On October 29, 1970, based upon appropriate HUD approval of the project, PHA and Multicon entered into an agreement of sale whereby Multicon was to construct 120 townhouses on the Whitman site. On October 30, 1970, RDA conveyed title to the Whitman Park Townhouse Project site to Multicon.

Prior to the signing of the contracts with Multicon, the community was involved in numerous meetings and correspondence with RDA, PHA and Multicon. On June 2, 1970, a meeting was held in the Whitman community attended by officials from RDA, PHA, Multicon and the Mayor's office. The meeting was held to give the community an opportunity to closely review the Multicon plans for the Whitman Park Townhouse Project. The community made several suggestions in connection with the building materials to be used in the project and fire safety for the completed townhouses. The suggestions were accepted and appropriate changes were made in the Whitman Park Townhouse Project plans. Also, the home ownership potential and the advantages thereof of a public housing development under Turnkey III were explained to the community. Community representatives stated after the June 2, 1970 meeting that the Whitman Park Townhouse Project plans "look excellent", that they were "very impressed with the plans" and felt that the houses would be "an asset to our community."

Although a groundbreaking ceremony was conducted on December 16, 1970, actual construction did not commence until March of 1971. As a result of the activities by demonstrators at the site, the builder was unable to proceed with construction since requested police protection was not forthcoming. At a conference on April 30, 1971, the City Managing Director stated that Multicon would not receive police assistance.

Shortly thereafter, there was a series of meetings and various changes in the Whitman Park Townhouse Project were proposed in order to settle the controversy, including opening a building in the project as a community recreation area, reserving 50% of the units for persons who were displaced by the clearance for the Whitman project, raising the income levels of those persons who would be eligible for the project and setting up a screening committee, which would include Whitman residents, to assure that those living in the houses would be an asset to the community. On May 17, 1971, after full discussion and consideration of the settlement proposals, the community voted down the final settlement offer of PHA. On May 18, 1971, Mayor Rizzo was nominated as the candidate for Mayor. On May 20, 1971, the Managing Director of Philadelphia again stated that the City would not provide police assistance for Multicon should it return to work, and the Chairman of PHA stated that he had been instructed by the Mayor to order Multicon not to resume work.

After he took office in January of 1972, Mayor Rizzo told the Chairman of PHA that because of the promise he had made to the people in the Whitman area, he did not want the Whitman Park Townhouse Project to proceed. The efforts of the builder to proceed with construction were finally terminated by the City paying the builder $806,000 to cancel the construction contract.

In referring to this Court's judgment order dated November 5, 1976, our Third Circuit Court of Appeals stated:

. . . the court found that the City had violated the Civil Rights Act of 1866 (42 U.S.C. §§ 1981 & 1982) and the Thirteenth and Fourteenth Amendments because the actions of the City had a racially discriminatory impact and were taken with a discriminatory purpose or motivation. 425 F.Supp. at 1024, 1025. We

conclude, as did the district court, that the City violated § 1981 and § 1982 by depriving plaintiffs of constitutional rights guaranteed by the Thirteenth and Fourteenth Amendments.

\*    \*    \*    \*    \*    \*

. . . The district court held that the City had acted with racially discriminatory intent, as evidenced by: (1) the City's joining in opposition to the Whitman Townhouse project with knowledge that some of that opposition was racially motivated; (2) Mayor Rizzo's explicit statements equating "public housing" with "Black housing" and his public stand "against placing such housing in White neighborhoods"; and (3) the City's taking steps to terminate the project with knowledge that the action would produce a racially discriminatory effect. 425 F.Supp. at 1025.

As for the actual consequences of the failure to construct the Whitman Townhouse project, the district court found the following effects of termination:

> The cancellation of the Whitman Park Townhouse Project had a racially disproportionate effect, adverse to Blacks and other minorities in Philadelphia. The waiting list for low-income public housing in Philadelphia is composed primarily of racial minorities. Of the 14,000 to 15,000 people on the waiting list for public housing in Philadelphia (N.T. 56–84), 85% are Black, and 95% are considered to be of racial minority background. (N.T. 40–103). Obviously those in housing projects, which are overwhelming Black, and those on the public housing waiting list, are those least able to move out of the poorer, racially impacted areas of Philadelphia. The evidence also established that Blacks in Philadelphia who are concentrated in the three major Black areas of Philadelphia, have the lowest median income in comparison with the total population of Philadelphia and live in the poorest housing in Philadelphia. The Whitman Park Townhouse Project was a unique op-

portunity for these Blacks living in racially impacted areas of Philadelphia to live in an integrated, non-racially impacted neighborhood in furtherance of the national policy enunciated in Title VIII of the Civil Rights Act of 1968. Public housing offers the only opportunity for these people, the lowest income Black households, to live outside of Black residential areas of Philadelphia. Cancellation of the project erased that opportunity and contributed to the maintenance of segregated housing in Philadelphia.

425 F.Supp. at 1018. This discriminatory effect and the invidious discriminatory purpose underlying the City's role in the project's termination together were found to establish a constitutional violation under *Washington v. Davis,* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597].

\*    \*    \*    \*    \*    \*

To remedy Philadelphia's violation of plaintiffs' constitutional rights, the district court ordered that the City take "all necessary steps for the construction of" and enjoined the City from interfering with, the Whitman project. 425 F.Supp. at 1029. We recognize that once a violation is found, "[t]he task is to correct, by balancing of the individual and collective interests, the condition that offends the Constitution." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, [91 S.Ct. 1267, 28 L.Ed.2d 554] (1971). Notwithstanding the Supreme Court's observation in *Swann* that "the scope of a district court's equitable powers to remedy past wrongs is broad", *id.* at 15, [91 S.Ct. 1267,] the Supreme Court has in recent equal protection cases given careful scrutiny to the choice of remedy to assure that the relief granted is no broader than that necessary to remove the violation and its effects. *E. g., Dayton Board of Education v. Brinkman,* 433 U.S. 406, 420, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). *See also Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). "Once a constitutional violation is found, a federal court is required to tailor

'the scope of a remedy' to fit 'the nature of the violation,'" *Brinkman, supra,* 433 U.S. at 420, 97 S.Ct. [2766] at 2775. In short, the federal equitable remedy must cure the constitutional defect but the dosage must not exceed that necessary to effect the cure.

Here, the injunctive relief decreed by the district court is directly responsive to and seeks to "cure" the violation proved, which arose with the City's resistance to, and obstruction of, the Whitman Townhouse project.

\* \* \* \* \* \*

In sum, therefore, it is apparent that by their actions PHA and RDA were responsible for making unavailable or denying housing, within the meaning of § 3604(a), to black families who otherwise would be living in Whitman. This discriminatory effect has not been justified under any standard, and the record bears out the need for, and propriety of, the relief granted by the district court with respect to the Whitman project.

We need comment only briefly on the form of the relief afforded by the district court in this respect. The district court was modest and conservative in the manner in which it corrected the statutory violation. Having no desire to become Philadelphia's "housing czar", *see* 425 F.Supp. at 1026, the district court required only that the construction of the Whitman project proceed as planned without further interference. In so providing, the district court did not venture outside the permissible boundaries of constitutional and statutory precepts.

564 F.2d at 140–50 (footnotes and citations omitted).

## CITY COUNCIL CANNOT ABROGATE THE COURT'S DECISION

[1] The recent happenings in the City Council of Philadelphia cannot interfere with the November 5, 1976 judgment of this Court, as affirmed by the Third Circuit Court of Appeals, concerning which certiorari was denied by the Supreme Court of the United States, which judgment ordered the construction of townhouses on the Whitman Park site. Should there come a day when the Council of a city, by a majority vote of its members, can overturn or obstruct a decision of the federal judiciary holding that the rights of a minority in the city were violated by the actions of city government, it would mean that the elected body of a city could effectively abrogate those inalienable rights guaranteed to all of us in the Constitution. It would mean that the judicial system of this nation, established pursuant to Article III of the Constitution, a judicial system upon which this nation has come to rely in times of crisis, would be without the power to enforce its decrees and would crumble. Fortunately, ours is a nation committed to the rule of law and our elected representatives are not above the law. It must be so under our Constitution, which guarantees rights to individuals, rights which cannot be destroyed by the democratically determined actions of the majority. It follows, therefore, that, although federal judicial decisions do frequently incur the wrath of the majority, under our tripartite constitutional form of government, such decisions are the law of the land and cannot be abrogated by legislative action. It is beyond question that legislative action cannot negate a Constitutionally based judicial decision. As the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 490–91, 86 S.Ct. 1602, 1636, 16 L.Ed.2d 694 (1966), stated:

> Judicial solutions to problems of constitutional dimension have evolved decade by decade. As courts have been presented with the need to enforce constitutional rights, they have found means of doing so. . . . Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them.

And as more recently reiterated by the Supreme Court in *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971): "[S]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees."

Ten days after the United States Supreme Court denied certiorari in *RAB v. Rizzo,* this Court, in a memorandum dated March 9, 1978, announced that before proceeding further with a contempt hearing against certain defendants, it would hold a meeting with all counsel in the case in an effort to have the parties agree concerning the procedures which each defendant should take in order to accomplish construction of the townhouses at the earliest date. As a result of this meeting, certain procedures were agreed to by the parties, including the following which were incorporated in this Court's memorandum of March 17, 1978:

10. The Technical Evaluation Committee (composed of the Office of Housing and Community Development, City Planning Commission, Philadelphia Housing Development Corporation, Philadelphia Industrial Development Corporation and RDA) shall review all bids to determine which bidder demonstrates the best financial capability and ability to perform while also giving affirmative consideration to minority bidders. The Technical Evaluation Committee may consult with HUD, PHA, Whitman Area Improvement Council, and counsel for plaintiffs in making this determination. The determination of best bidder proposal shall be made by June 26, 1978.

13. The Boards of RDA and PHA shall pass resolutions approving the new redeveloper, the form of the Redevelopment Contract and Agreement of Sale, subject to HUD approval, by September 25, 1978.

14. RDA shall, by October 2, 1978, prepare and present to City Council such documents as are necessary for the purpose of obtaining Councilmanic approval of the new redeveloper and the Redevelopment Contract.

15. City Council shall expeditiously consider the new redeveloper and the Redevelopment Contract, and final action by Council in connection therewith shall be taken no later than November 9, 1978.

16. In the event the Mayor is required to take action in connection with Councilmanic approval of the new redeveloper and the Redevelopment Contract, the Mayor shall take such action by November 19, 1978.

The Court, in its memorandum of March 17, 1978, concluded as follows:

The Court has determined to accept the agreement of the parties (with all portions objected to deleted) as a specification of the necessary procedures and the time-schedule required to complete construction of the 120 townhouses, pursuant to the Court's Order of November 5, 1976.

▮ Thus, the Court, desiring to enforce its injunctive order without resort to contempt proceedings, accepted the agreement made by the defendants, including the City of Philadelphia, that City Council be given the opportunity to determine for itself that the contract with the new redeveloper was in conformity with the plan it had approved for the Whitman site on October 27, 1970. In the opinion of this Court, 35 P.S. § 1710(j)[2] did not require the contract to be submitted to City Council for its approval, since the Court's Order of November 5, 1976 specifically provided that the townhouses were to be constructed in accordance with the plans which had been approved by City Council on October 27, 1970. In any event, the law is clear that this Court, for the purpose of remedying the Constitutional violations, has the power to suspend the operation of such a statute. In a somewhat

---

2. 35 P.S. § 1710(j) provides:

The redevelopment proposal may contain the form of the redevelopment contract with the redeveloper selected and upon approval by the governing body of the proposal, as hereinbefore provided, the Authority is authorized to execute the said redevelopment contract. If the proposal does not contain the form of the redevelopment contract with the redeveloper selected, the Authority shall not execute a redevelopment contract with a redeveloper thereafter selected, until the said redevelopment contract shall have been approved by the governing body and found to be in substantial conformity with the proposal theretofore approved by the governing body. No additional public hearing notice or publication shall be required with respect to such approval.

similar situation, the United States District Court bypassed the Chicago City Council, and the Seventh Circuit on appeal stated: "The district court had undoubted power to suspend the operation of the state statute." *Gautreaux v. Chicago,* 480 F.2d 210, 214 (7th Cir. 1973), *cert. denied,* 414 U.S. 1144, 94 S.Ct. 895, 39 L.Ed.2d 98 (1974).

A review of the Notes of Testimony taken at the public hearing before City Council reveals a climate of confusion and misunderstanding. City Council did not consider whether the contract with the new redeveloper was in conformity with the plan it had approved. Instead, the desirability of building townhouses on the Whitman site was considered. That decision was made many years ago—*not by this Court,* but by federal, state, and city authorities, with the approval of City Council, pursuant to an Act of Congress specially sponsored by the late Congressman Barrett at the request of his constituents from the Whitman area.

■■■ The Law Department of the City has filed with this Court a copy of a resolution passed by Council concerning the development of scattered site housing in the Whitman Urban Renewal Area. The City has filed a motion, pursuant to Fed.R.Civ.P. 60(b)(5) and (6), to amend the Court's judgment order of November 5, 1976—an order affirmed by the Third Circuit Court of Appeals concerning which certiorari has been denied by the Supreme Court of the United States. A court lacks the power to modify in any material respect its judgment which has been affirmed, in relevant part, by the Court of Appeals. *Briggs v. Pennsylvania R. Co.,* 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948); *Ratay v. Lincoln Nat'l Life Ins. Co.,* 405 F.2d 286 (3d Cir. 1968). A court may, however, grant relief from such a judgment, if the requirements of Rule 60 are satisfied; this is a matter for the district court to determine. *Standard Oil Co. of California v. U. S.,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976). This Court finds that the City has failed to present any reason sufficient to justify relief from the operation of the judgment of this Court entered November 5, 1976.

■■■ Furthermore, the policy decision as to whether to build a high-rise or townhouses, or to rehabilitate old houses, was not then, and is not now, a matter for judicial determination by this Court. This issue was adjudicated in this Court's opinion of November 5, 1976. *See RAB v. Rizzo,* 425 F.Supp. at 1027. The doctrine of res judicata is therefore another reason barring further consideration by this Court of scattered site housing as a substitute for the townhouses. *Hubicki v. ACF Industries,* 484 F.2d 519, 524 (3d Cir. 1973). The approval of this Court is obviously not necessary should the appropriate authorities desire to rehabilitate houses in the Whitman area, it being understood, of course, that such rehabilitation of houses in the Whitman Urban Renewal Area shall in no way interfere with this Court's order concerning the construction of the 120 townhouses on the Whitman site.

The proposed contract with the new redeveloper reveals that the cost of construction of the townhouses will be substantially higher than the original contract that was canceled by the City. This Court understands that many, including City Council, are concerned with the increased cost of the townhouses, an increase caused by inflation, and possibly by the fears or pressures which may have inhibited local builders from participating in the bidding. In addition to the increased cost of the houses themselves, there is, of course, the $806,000 paid by the City to the original builder in cancellation of the original construction contract. Although the question of who should finally bear these increased costs brought about by discriminatory acts in violation of the Constitution has not been presented to this Court, it is a matter which may deserve the Court's consideration at some future time.

There is no question that the federal court has the power to enforce its decisions, and in matters such as this where the judgment of the Court has mandated that certain actions be taken by the parties, enforcement of such orders is often brought about by holding the recalcitrant party in contempt, which often means a fine and/or

imprisonment. So far, the Court has not found it necessary to resort to contempt proceedings and will do so only when it becomes necessary to the enforcement of the judgment.

Accordingly, the townhouses shall be constructed as ordered by this Court on November 5, 1976 and the Court's memorandum of March 17, 1978, amended June 30, 1978, October 13, 1978, November 3, 1978, and November 13, 1978, shall be further amended as follows:

Paragraph 17 shall be amended to provide:

17. HUD shall give its approval to the new redeveloper, A & R Development Corp./The Waterford Group, Inc., and Redevelopment Contract, and PHA, RDA and the A & R Development Corp./The Waterford Group, Inc. shall execute the Redevelopment Contract and Agreement of Sale, together with all necessary documents on or before January 19, 1979.

Paragraph 18 shall be amended to provide:

18. Settlement shall take place on or before February 9, 1979.

Paragraphs 15 and 16 of this Court's memorandum will be considered as deleted for the reasons herein set forth.