Terri Lee HALDERMAN, et al., Plaintiffs,

v.

PENNHURST STATE SCHOOL AND HOSPITAL, et al., Defendants,

United States of America, Plaintiff-Intervenor,

Pennsylvania Association For Retarded Citizens, et al., Plaintiffs-Intervenors.

Civ. A. No. 74–1345.

United States District Court, E. D. Pennsylvania.

Aug. 25, 1981.

David Ferleger, Philadelphia, Pa., for Terri Lee Halderman.

Thomas M. Kittredge, Philadelphia, Pa., for Bucks, Chester and Delaware Counties.

Robert B. Hoffman, Deputy Atty. Gen., Harrisburg, Pa., for Commonwealth of Pennsylvania.

Thomas Gilhool, Public Interest Law Center, Philadelphia, Pa., for Pennsylvania Association for Retarded Citizens.

Herbert B. Newberg, Philadelphia, Pa., for David Ferleger.

Pamela P. Cohen, Philadelphia, Pa., for Pennhurst Parents Association.

R. Stephen Barrett, Asst. County Sol., Norristown, Pa., for Montgomery County.

Marc H. Myers, Asst. City Sol., Philadelphia, Pa., for Philadelphia County.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

On July 24, 1981, this Court held a hearing on a Rule to Show Cause why the Commonwealth defendants should not be held in civil contempt in connection with the Commonwealth's failure to comply with this Court's Order of June 4, 1981 to pay $67,746.08 into the Registry of this Court on or before July 1, 1981 for the purpose of defraying the costs of the Special Master and the Hearing Master.

In an opinion filed on December 23, 1977, this Court made findings of fact and conclusions of law in which it found that the defendants were violating the constitutional and statutory rights of the members of the plaintiff class by failing to provide them with minimally adequate habilitation in the least restrictive environment. By "adequate habilitation" we mean such education, training, and care as will better enable a retarded person to cope with life as effectively as his or her capacities will permit. As the trial record in this case reveals, all parties to this litigation admitted that the residents of Pennhurst were not receiving minimally adequate habilitation. The average stay of a resident at Pennhurst is 21 years, and the testimony showed that a majority of them had regressed in that their level of functioning had declined when compared to the skills which they possessed at the time of admittance to Pennhurst. On many occasions since the trial, all parties have agreed with the many experts who testified at the trial that normalization is now universally accepted as the most beneficial method of habilitating a retarded person. Normalization is the antithesis of institutionalization and is based upon the fact that the education, training and care of a retarded person should be accomplished in a community living arrangement. This Court found that Pennhurst as an institution is inappropriate and inadequate as a place to habilitate the retarded. At the trial, the Commonwealth represented that it intended to close Pennhurst in the early 1980's.

On January 6, 1978, this Court held a further hearing for the purpose of determining the relief which should be granted. The parties were asked to attempt to reach an agreement on the appropriate relief. When the parties informed the Court that they could not agree on an order, the Court requested that they submit separate proposed orders. Finally, on March 17, 1978, the Court issued an Order directing the County and Commonwealth defendants to provide adequate community living arrangements and services for the residents of Pennhurst and the other retarded persons who were awaiting admission to Pennhurst. This Court further ordered that individual habilitation plans be developed for each member of the plaintiff class, that

appropriate community monitoring mechanisms be designed and implemented, and that a Special Master be appointed to monitor defendants' planning for and the providing of community living arrangements and services in addition to monitoring living conditions at Pennhurst. The primary function of the Special Master in this case is to monitor the actions of the Commonwealth and County defendants in an effort to make certain that the retarded residents of Pennhurst receive such treatment, care, and education in an unsegregated environment as this Court found they had a right to under the United States Constitution. That a Master is needed to monitor compliance with the Court's Orders is apparent from the fact that the defendants, when not faced with contempt proceedings during a period of more than two years from the entry of this Court's Order of March 17, 1978 through the end of August 1980, transferred only 122 of approximately 1,200 residents of Pennhurst to community living arrangements.

The defendants appealed and on December 13, 1979, the Court of Appeals issued an Order substantially affirming this Court's Order of March 17, 1978, and remanded the matter to this Court for further proceedings. As pointed out by our Circuit Court, the defendants contended that this Court's appointment of a Master was improper under Fed.R.Civ.P. 53(b). The Circuit Court, in rejecting this contention, stated:

> It is abundantly clear that providing the 1,200 Pennhurst residents with a right to habilitation in the least restrictive environment will be a complex and lengthy process, probably involving monitoring, dispute resolution, and development of detailed enforcement mechanisms. Were we to preclude the trial court from resorting to a master, we would help make self-fulfilling the frequently made prophecy that courts are institutionally incapable of remedying wholesale violations of legally protected rights.
>
> .     .     .     .     .     .
>
> In this case, moreover, the court's resort to use of a master is particularly appropriate. After the decision on liability was announced, the appellants were afforded an opportunity to devise and present their own remedies for conditions at Pennhurst. They failed to do so. At that point, having received insufficient assistance from the officials directly involved, the court was faced with the choice of massive personal participation in devising a complex scheme for remedying the violations that were found, or of proceeding with the assistance of a master, whose functions would be supplementary to and supervisory over those of the Commonwealth and County defendants. We hold that the trial court chose correctly in ordering the appointment of a master.

*Halderman v. Pennhurst*, 612 F.2d 84, 111–12 (3d Cir. 1979).

The Third Circuit also upheld this Court's "determination that, for the retarded class members as a whole, Pennhurst cannot be an appropriate setting in which to provide habilitation." (612 F.2d at 114). The Circuit Court in remanding the matter to this Court also directed that an individual hearing should be held for any Pennhurst resident who contends that the living arrangements and services available at Pennhurst are more beneficial to his or her habilitation than those made available in the community.

In light of the Third Circuit's opinion, this Court, on April 24, 1980, issued an Order incorporating and amending its prior Orders, including the March 17, 1978 Order. In its April 24, 1980 Order, this Court established an impartial hearing procedure and appointed a Hearing Master to provide an individual hearing for any resident of Pennhurst who claims that the living arrangements and services available at Pennhurst are more beneficial to habilitation than those made available in the community.

The United States Supreme Court granted *certiorari* in this case on June 10, 1980, and on June 30, 1980 entered a stay order pending final disposition. The Supreme Court's stay order limits transfers from Pennhurst to those retarded residents of

Pennhurst whose transfer is "voluntary." On July 14, 1980, this Court ordered the Hearing Master to hold a hearing for each Pennhurst resident for whom a community living arrangement has been prepared, for the purpose of determining whether the proposed transfer from Pennhurst to the community is "voluntary." On December 1, 1980, the Supreme Court declined to disturb this Court's interpretation and application of its limited stay order.

This Court's Orders provide that the Special Master and the Hearing Master shall be compensated by the Commonwealth defendants. (Orders of March 17, 1978, July 27, 1978, April 24, 1980, and June 10, 1980). For the fiscal years 1978–79, 1979–80, and 1980–81, the costs of the Masters have been paid by the Commonwealth. Funds for these payments were included in the Commonwealth's budget for Pennhurst. The Commonwealth defendants did not appeal any of the payment Orders for those fiscal years, nor did they ever question the amounts of those payment Orders. For fiscal year 1981–82, however, the Department of Public Welfare ("DPW") requested a separate appropriation to pay the amounts ordered by the Court to defray the expenses of the Masters. In its 1981–82 Budget Briefing Book, DPW stated that "the Special Master's responsibilities duplicate the authority and responsibility of either DPW/OMR or the counties funded by the Commonwealth for the purposes of service provision." It was further stated in the Budget Briefing Book:

> To meet the monthly Court Orders for payment to each Master, DPW/OMR has requested $.9 million. Although the dollars will not provide for the maintenance or expansion of client services in the community or Pennhurst itself, the dollars are sought pursuant to Court Orders regarding funding of the Master's Offices.

The Honorable Helen O'Bannon, the Secretary of DPW, in testifying on March 4, 1981, before the House of Representatives Committee on Appropriations, made the following statements concerning the budget request for funds to pay the expenses of the Masters' offices as ordered by the Court:

REPRESENTATIVE COHEN: I'm just curious as to what power we have here, if any. Suppose we cut it to 450,-000? What would happen? We would be ordered to increase it to $900,000.00?

SECRETARY O'BANNON: No. Because you're not defendants on the suit.

REPRESENTATIVE COHEN: You as the Department?

SECRETARY O'BANNON: I have no authority to increase it. I do not appropriate money.

REPRESENTATIVE COHEN: So therefore, you are saying we do have the authority to cut or increase?

SECRETARY O'BANNON: Yes. And you always have that authority. Judge Broderick cannot take that away from you.

REPRESENTATIVE COHEN: And Judge Broderick has no reasonable means of recourse?

SECRETARY O'BANNON: Judge Broderick is a very clever jurist. I would not like to guess his means of recourse.

REPRESENTATIVE COHEN: I am curious as to who would go to jail.

REPRESENTATIVE ARTY: I will take you in to protective custody.

REPRESENTATIVE COHEN: To what degree is the $900,000.00 justified? In terms—

SECRETARY O'BANNON: I can't answer that. I think the whole masters office is a redundant, ridiculous piece of bureaucracy.

(Applause)

.        .        .        .        .

REPRESENTATIVE COHEN: We have no recourse other than to slash the budget from $900,000.00? If we don't want you to go to jail?

SECRETARY O'BANNON: You have all the recourse and power at your command and we will see what we will see. I am a risk taker. I wouldn't be in this job if I weren't.

On March 12, 1981, Secretary O'Bannon testified before the Senate Appropriations Committee concerning DPW's budget request for the Masters' costs. The following discussion took place at that hearing:

A. It's when—compliments of Judge Broderick's machinery, namely the Master—that we can't move anyone. Ah, and we have set up a decision-making, and a professional evaluation process outside the state system, and outside the state and county's responsibility, named the Master. And nothing is good enough for the Master. And enough, and redundant enough, is never enough. In other words, we have got to do more and more.

So I think that, absent Judge Broderick's Order, you would see a much more orderly flow of lower cost programs, in the sense that we would be able to serve more clients through Wood-Haven.

Q. Okay. This is a third, and unfair question, but what do you think would happen if this legislature refused to fund the Master's Office of Judge Broderick? Would that go out of existence? Or, what would happen?

A. No, I think I would be held in contempt.

Q. You have already announced that you are going to, ah, ah, oppose the implementation of this latest Order.

A. Ah, I don't believe everything I read in the newspapers. Fortunately. What I did say was, I would not move people into the community before the community and the person was ready. I will not dump clients.

SENATOR HOWARD: Thank you both, Senator Early and Chairman Tilghman.

THE CHAIRMAN: Just a second, I didn't hear it. Who would be held in contempt if we didn't fund it?

SECRETARY O'BANNON: I would. For not paying their bills.

The Legislature proceeded to cut the appropriation for the Masters' costs from $900,000 to $35,000, and added the following language:

It is the intent of the General Assembly that this appropriation be used for shutdown costs and that no other funds of the Commonwealth be spent for these functions.

On June 4, 1981, this Court signed, and on June 5, 1981, the Clerk entered two orders for payment of the costs of the Special Master and the Hearing Master for the month of July, 1981, in the amounts, respectively, of $59,152.74 and $8,593.34, for a total of $67,746.08. The Orders specified that payment was to be made "on or before the first day of July, 1981."

In a letter dated June 25, 1981, the attorney for the Commonwealth defendants informed the Court that the Commonwealth would pay no more than the $35,000 for the expenses of the Masters for the fiscal year beginning July 1, 1981 through June 30, 1982.

The Commonwealth made no payment pursuant to the June 4, 1981 Order on or before July 1, 1981. At a conference on July 6, 1981, the Commonwealth advised the Court that it would soon be paying $35,000 into the Registry of the Court for the expenses of the Masters and that no additional sums would be paid for that purpose unless the Legislature passed a supplemental appropriation. On July 7, 1981, this Court issued an Order to show cause why the Commonwealth defendants should not be held in civil contempt in connection with their failure to comply with the Court's Order of June 4, 1981 to pay $67,746.08 into the Registry of the Court on or before July 1, 1981 for the purpose of defraying the costs of the Special Master and the Hearing Master. On or about July 13, 1981, the Commonwealth paid into the Registry of the Court the sum of $35,000. On July 16, 1981, this Court entered an Order directing that the $35,000 be paid to the Office of the Special Master and made a finding that the Commonwealth was in default in the amount of $32,746.08.

On July 14, 1981, this Court ordered the Commonwealth defendants to pay to the Registry of the Court for the operation of the Masters' Offices for the month of Au-

gust, 1981, the sum of $67,746.07. The Commonwealth has not paid any sum for August and has advised the Court that it does not intend to make any further payments.

On July 24, 1981, at the hearing on the Order to show cause why the Commonwealth defendants should not be held in civil contempt, the Commonwealth again advised the Court that it did not intend to comply with the Court's Orders concerning the expenses of the Masters. The Commonwealth stated on the record that it was not "contest[ing] the underlying validity of [the Court's] Orders." (N.T. at 100). The Commonwealth contended, however, that "Helen O'Bannon [Secretary of DPW] is disabled from paying more than $35,000 to the Court for this purpose by valid legislative enactment." (N.T. at 90).

On four occasions since March 17, 1978, the defendants have asked this Court to stay its Orders. In each instance, the request for a stay has been denied. On seven occasions, the Court of Appeals and the United States Supreme Court have likewise refused to stay the basic thrust of this Court's Orders pending disposition of the appeals.

The United States Supreme Court has stated that "federal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced.... If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Hutto v. Finney*, 437 U.S. 678, 690–91, 98 S.Ct. 2565, 2573–74, 57 L.Ed.2d 522 (1978).

Liability for civil contempt accrues when a defendant violates an Order, knowing it to have been issued. *Thompson v. Johnson*, 410 F.Supp. 633 (E.D.Pa.1976), aff'd, 556 F.2d 568 (3d Cir. 1977). The purpose of a civil contempt remedy is to coerce compliance with the court order and to compensate the party who is the beneficiary of the court order for the failure to comply. *Cromaglass Corp. v. Ferm*, 500 F.2d 601, 604 (3d Cir. 1974); *U. S. v. Spectro Foods Corp.*, 544 F.2d 1175, 1182–83 (3d Cir. 1976).

Commonwealth defendants assert a two-pronged defense to the contempt charge. It is claimed (1) that Secretary O'Bannon acted in good faith, and (2) that the action of the Legislature has raised a state law barrier to compliance. "Good faith" is not generally recognized as a defense to civil contempt. As the United States Supreme Court stated in *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949):

> The absence of wilfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance.... Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act. The decree was not fashioned so as to grant or withhold its benefits dependent on the state of mind of respondents. It laid on them a duty to obey specified provisions.... An act does not cease to be a violation of . . . a decree merely because it may have been done innocently.

"The fact that prohibited acts may have been done inadvertently or in good faith does not, in and of itself, preclude a finding of contempt." *Thompson v. Johnson*, 410 F.Supp. 633, 640 (E.D.Pa.1976), aff'd, 556 F.2d 568 (3d Cir. 1977). Because the purpose of civil contempt is not to punish, but to correct, the role of the Court is not to fix blame on the defendants but rather to prevent a recurrence and to repair any damage that has been done. The Court's Order in this case must be obeyed by the Commonwealth defendants regardless of whether the defendants tried in good faith to carry out the terms of the injunction. *Landman v. Royster*, 354 F.Supp. 1292, 1300–01 (E.D. Va.1973), citing *Doe v. General Hospital*, 434 F.2d 427 (D.C.Cir.1970).

The Court finds, however, that the evidence before the Court in this contempt proceeding clearly establishes that Secretary O'Bannon was not acting in good faith.

As heretofore pointed out, Secretary O'Bannon, in her testimony before the House of Representatives Committee on Appropriations on March 4, 1981, made statements which in effect suggested that the Committee *not* appropriate money for the Masters, and when asked whether it would be a violation of the Court's Order she replied "I am a risk taker. I wouldn't be in this job if I weren't." Again, on March 12, 1981, when she testified before the Senate Appropriations Committee, she once again made it clear to the Committee that she was *not* requesting funds for the Masters. And when asked what she thought would happen "if this legislature refused to fund the Master's Office," her reply was: "I think I would be held in contempt." We find that this action of Secretary O'Bannon was a blatant attempt to defy this Court's Orders.

The actions of Secretary O'Bannon were apparently taken without the advice of counsel. The Attorney General of Pennsylvania who represents the Secretary in this litigation probably would not advise anyone to act in defiance of this Court's Order. The Attorney General, who is now an elected officer in this Commonwealth, has taken an oath to uphold the Constitution of the United States, Article VI of which provides: "This Constitution, and the Laws of the United States which shall be made in pursuance thereof...shall be the supreme law of the Land...." As our Third Circuit recently stated:

[T]he fourteenth amendment is the supreme law of the land in all of Pennsylvania. All executive officers of Pennsylvania, including the Attorney General, have taken the oath prescribed by Article IV, Section 6, Clause 3, to uphold that amendment. *See* 71 P.S. § 761; Pa. Const. Art. 6, § 3. By virtue of the supremacy clause, the Commonwealth has the same interest in compliance with the standard of conduct laid down by the fourteenth amendment as it has in compliance with standards of conduct enacted by the Pennsylvania Legislature.

*Commonwealth of Pennsylvania v. Porter*, 659 F.2d 306 at 314 (3d Cir., 1981).

Secretary O'Bannon was well aware when she made her statements to the House and Senate Appropriations Committees, as she is now, that the failure to pay the expenses of the Special Master means that the Master's Office will be unable to function and will be forced to cease their functions of monitoring the actions of the Commonwealth for the purpose of ensuring that the residents of Pennhurst receive the minimally adequate habilitation ordered by this Court. The Special Master's Office and the Hearing Master's Office have been functioning without pay for the past six weeks. They have been working on a volunteer basis. The Commonwealth defendants are well aware that without pay these Offices will be compelled to cease functioning.

As heretofore pointed out (at pages 634–635), Secretary O'Bannon in her Budget Briefing Book and in her testimony before the House and Senate Appropriations Committees, stated that the functions of the Special Master duplicated services being performed by the Commonwealth and County defendants. The Secretary labelled the work of the Special Master as "redundant." Although Secretary O'Bannon's claims of duplication and redundancy may have influenced the Legislature, such allegations are not a defense to these contempt proceedings. The allegations of duplication and redundancy have never been raised by the Commonwealth defendants in this litigation. The primary function of the Special Master, as heretofore pointed out, is to monitor compliance with the Court's Orders. The Court therefore intends to issue a separate Order which will schedule a hearing for the purpose of determining what, if any, services being performed by the Special Master are duplicating work being performed by any defendant.

The Hearing Master was appointed pursuant to the suggestion of the Court of Appeals for the purpose of holding an individual hearing for any Pennhurst resident who contends that the living arrangements and services being provided at Pennhurst are more beneficial to habilitation than

those made available for him or her in the community. The Hearing Master also holds hearings pursuant to the stay order of the Supreme Court to determine whether the transfer of a Pennhurst resident to the community is "voluntary." The functions of the Hearing Master are clearly not duplicative or redundant.

There is no question that federal court orders often incur the wrath of many people. There is also no question that the same United States Constitution that guarantees rights to the retarded citizens of this country, also guarantees to all its citizens the right to criticize and object. The Court wishes to make it clear that its finding that Secretary O'Bannon is in contempt is not in any way based upon her criticisms of this Court or its Orders. The Court's finding of contempt is based solely upon her acts and statements directed toward the abrogation of the Court's Order that specifically directed the Commonwealth defendants to fund the Masters' offices. Under our tripartite Constitutional form of government, an order of a federal court entered for the purpose of enforcing constitutional rights cannot be evaded by any citizen, even one who holds high public office and considers herself a "risk taker." Informed citizens and high public officials who are parties to litigation in a federal court are well aware that court orders must be obeyed until such time as the order is stayed or reversed on appeal. As heretofore indicated, the Commonwealth defendants in this litigation are well aware of the "stay" and appeal procedures.

The Court finds that Secretary O'Bannon and the Department of Public Welfare violated their obligation to act diligently and with steadfast purpose to effectuate the Orders of this Court. *Aspira v. Board of Education of City of New York,* 423 F.Supp. 647 (S.D.N.Y.1976).

Commonwealth defendants' contention that the action of the Legislature prevents compliance with this Court's Orders is unpersuasive. As this Court recently stated:

Should there come a day when [a legislative body] by a majority vote of its members, can overturn or obstruct a decision of the federal judiciary holding that the rights of a minority...were violated by the actions of...government, it would mean that the elected body...could effectively abrogate those inalienable rights guaranteed to all of us in the Constitution. It would mean that the judicial system of this nation, established pursuant to Article III of the Constitution, a judicial system upon which this nation has come to rely in times of crisis, would be without the the power to enforce its decrees and would crumble. Fortunately, ours is a nation committed to the rule of law and our elected representatives are not above the law. It must be so under our Constitution, which guarantees rights to individuals, rights which cannot be destroyed by the democratically determined actions of the majority. It follows, therefore, that, although federal judicial decisions do frequently incur the wrath of the majority, under our tripartite constitutional form of government, such decisions are the law of the land and cannot be abrogated by legislative action. It is beyond question that legislative action cannot negate a Constitutionally based judicial decision.

*Resident Advisory Board v. Rizzo,* 463 F.Supp. 694, 700 (E.D.Pa.1979). The action of the Legislature of this Commonwealth in refusing to appropriate funds for the Masters and in expressing an intention that no other funds of the Commonwealth be used for the Masters cannot abrogate the Order of this Court based upon the right of the retarded residents of Pennhurst to such education, training, and care as will better enable them to cope with life as effectively as their capacities will permit. As heretofore pointed out, the Masters are an integral part of the remedy prescribed by this Court to make certain that the Commonwealth provides minimally adequate habilitation to the retarded residents of Pennhurst.

█ It is clear that a "[s]tate-law prohibition against compliance with the District Court's decree cannot survive the command

of the Supremacy Clause of the United States Constitution." *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 695, 99 S.Ct. 3055, 3079, 61 L.Ed.2d 823 (1979). As the United States Supreme Court stated in *Cooper v. Aaron*, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958):

> It follows that the interpretation of the Fourteenth Amendment enunciated by this Court...is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States "any thing in the Constitution or Laws of any State to the contrary notwithstanding." Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, ¶ 3 "to support this Constitution." Chief Justice Taney, speaking for a unanimous Court in 1859, said that this requirement reflected the framers' "anxiety to preserve it [the Constitution] in full force, in all its powers, and to guard against resistance to or evasion of its authority, on the part of a State...." *Ableman v. Booth*, 21 How. 506, 524, 16 L.Ed. 169. No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it. Chief Justice Marshall spoke for a unanimous Court in saying that: "If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery...." *United States v. Peters*, 5 Cranch 115, 136, 3 L.Ed. 53.

Thereafter, in *Miranda v. Arizona*, 384 U.S. 436, 490–91, 86 S.Ct. 1602, 1636–37, 16 L.Ed.2d 694 (1966), the Supreme Court stated:

> Judicial solutions to problems of constitutional dimension have evolved decade by decade. As courts have been presented with the need to enforce constitutional rights, they have found means of doing so.... Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them.

And as more recently reiterated by the Supreme Court in *North Carolina State Board of Education v. Swann*, 402 U.S. 43, 45, 91 S.Ct. 1284, 1285, 28 L.Ed.2d 586 (1971): "[S]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees."

The action of the Pennsylvania legislature cannot and does not preclude compliance by the Commonwealth defendants with the Orders of this Court based upon the United States Constitution and a federal statute.

■ The costs for the Masters in this case are costs of litigation. *Newman v. State of Alabama*, 559 F.2d 283, 290 (5th Cir. 1977). It is well settled that "[w]hen a State defends a suit for prospective relief, it is not exempt from the ordinary discipline of the courtroom.... [A] federal court may treat a state like any other litigant when it assesses costs." *Hutto v. Finney*, 437 U.S. 678, 695–96, 98 S.Ct. 2565, 2575–76, 57 L.Ed.2d 522 (1978). The award of such costs is not barred by the Eleventh Amendment. "Unlike ordinary 'retroactive' relief, such as damages or restitution, an award of costs does not compensate the plaintiff for the injury that first brought him into court. Instead, the award reimburses him for a portion of the expenses incurred in seeking prospective relief." *Id.* at 695 n.2, 98 S.Ct. at 2575 n.2. The functions of the Masters solely involve present and future compliance with this Court's Orders, and do not relate to compensation of the plaintiffs for past violations of their rights. The payment of money for the Masters is not compensation of the plaintiffs for their confinement at Pennhurst but rather is a method of ensuring constitutionally adequate conduct by defendants in the future. Therefore, awarding the costs of the Masters against the Commonwealth defendants does not contravene the Eleventh Amendment. *Samuel v. University of Pittsburgh*, 538 F.2d 991, 999 (3d Cir. 1976).

For the reasons hereinabove set forth, this Court finds that Secretary O'Bannon and the Department of Public Welfare of

the Commonwealth of Pennsylvania are in contempt of the Orders of this Court dated June 4, 1981 and July 14, 1981, which require the Commonwealth defendants to pay the expenses of the Masters.

This Court will enter an Order imposing on Secretary O'Bannon and the Department of Public Welfare civil fines totalling $10,000 per day for each day after September 2, 1981, that full payment has not been made pursuant to this Court's Orders of June 4, 1981 and July 14, 1981. In the event Secretary O'Bannon and the Department of Public Welfare do not make full payment pursuant to the Orders of June 4, 1981 and July 14, 1981 on or before September 2, 1981, the plaintiffs will be directed to take such steps as are legally necessary to add the Honorable R. Budd Dwyer, Treasurer of the Commonwealth of Pennsylvania, as a party defendant in this action.

The Court will also enter an Order directing the Department of Public Welfare and Secretary O'Bannon to appear before this Court at 9:30 A.M. on Thursday, October 15, 1981, to show cause why the Court should not impose on them a compensatory fine in an amount sufficient to compensate the plaintiffs for the costs and counsel fees incurred in the preparation and trial of these contempt proceedings.

For the purpose of ascertaining the amount of the compensatory fine sufficient to compensate plaintiffs for costs and counsel fees, the plaintiffs will be ordered to submit affidavits on or before October 1, 1981, setting forth in detail the time expended by counsel, the matter upon which the time was expended, and the costs incurred in the preparation and trial of these contempt proceedings.

### ORDER

AND NOW, this 25th day of August, 1981, the Court having held a hearing on July 24, 1981, on a Rule to Show Cause why the Commonwealth defendants should not be held in civil contempt for failure to comply with this Court's Orders of June 4, 1981 to pay $67,746.08 into the Registry of this Court on or before July 1, 1981 for the purpose of defraying the costs of the Special Master and the Hearing Master; the Court having found that the Department of Public Welfare of the Commonwealth of Pennsylvania and the Honorable Helen O'Bannon, Secretary of the Department of Public Welfare, are in contempt of the Orders of this Court dated June 4, 1981 and July 14, 1981 which require the Commonwealth defendants to pay the expenses of the Masters; for the reasons set forth in this Court's Memorandum dated August 25, 1981, it is hereby ORDERED that:

1. The Department of Public Welfare and the Honorable Helen O'Bannon, Secretary of the Department of Public Welfare, shall pay into the Registry of this Court civil fines totalling $10,000 per day for each day after September 2, 1981, that full payment has not been made pursuant to this Court's Orders of June 4, 1981 and July 14, 1981.

2. In the event the Department of Public Welfare and the Honorable Helen O'Bannon, Secretary of the Department of Public Welfare, do not make full payment pursuant to the Orders of June 4, 1981 and July 14, 1981 on or before September 2, 1981, the plaintiffs shall take such steps as are legally necessary to add the Honorable R. Budd Dwyer, Treasurer of the Commonwealth of Pennsylvania, as a party defendant in this action.

3. The Department of Public Welfare and the Honorable Helen O'Bannon, Secretary of the Department of Public Welfare, shall appear before this Court on Thursday, October 15, 1981, at 9:30 A.M. in Courtroom 10B, United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, to show cause why the Court should not impose on them a compensatory fine in an amount sufficient to compensate the plaintiffs for the costs and counsel fees incurred in the preparation and trial of these contempt proceedings.

4. For the purpose of ascertaining the amount of the compensatory fine sufficient to compensate plaintiffs for costs and counsel fees, the plaintiffs shall submit affida-

vits on or before October 1, 1981, setting forth in detail the time expended by counsel, the matter upon which the time was expended, and the costs incurred in the preparation and trial of these contempt proceedings.